WILLIAM HOLSTER, SUBSTITUTED PLAINTIFF-RESPONDENT, v. THE BOARD OF TRUSTEES OF THE PASSAIC COUNTY COLLEGE, *ET ALS.*, DEFENDANTS, AND RALPH A. DUNGAN, *ET ALS.*, DEFENDANTS-APPELLANTS, AND CITY OF PATERSON, DEFENDANT-INTERVENOR-APPELLANT.

Argued June 7, 1971—Decided July 9, 1971.

*Mr. George F. Kugler, Jr.* argued the cause for defendants-appellants (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel and on the brief; *Mr. Victor Librizzi, Jr., Mr. Gordon J. Golum, Mr. Philip I. Kagan,* Deputy Attorneys General, on the brief).

*Mr. Joseph L. Conn* argued the cause for defendant-intervenor-appellant (*Mr. Joseph L. Conn,* City Counsel and Attorney; *Mr. Henry Ramer,* on the brief).

*Mr. Herman W. Steinberg* filed a statement in lieu of brief on behalf of defendant Board of Chosen Freeholders of Passaic County.

*Mr. Uldric L. Fiore* filed a statement in lieu of brief on behalf of defendant Board of Trustees of the Passaic County College.

*Mr. Arthur J. Sullivan, Jr.,* argued the cause for substituted plaintiff-respondent.

The opinion of the court was delivered by

MOUNTAIN, J. This appeal presents for review the issue as to the constitutionality of the County College Bond Act, *L.* 1971, *c.* 12 (*N. J. S. A.* 18A:64A–22.1 to 22.8). The judge who heard the matter below reached a determination that the act was unconstitutional, 114 *N. J. Super.* 228 (Law Div. 1971). Notice of appeal was filed in the Appellate Division and before argument this Court granted certification.

The statute in question supplements an act passed in 1962 which provided for the creation of county colleges, *N. J. S. A.* 18A:64A–1 *et seq.,* and must be examined in the context of

that legislation to be clearly understood. In brief, the earlier enabling act provides a method whereby counties throughout the state may establish local two-year colleges. Such a project may be undertaken by a single county or by two or more counties acting together. The college, when established, comes under the general supervision of the State Board of Higher Education but is more directly governed by a board of trustees, locally selected, in which is reposed general powers of administration and control.

It is the manner in which county colleges are financed that is here our chief concern. The original enabling act provides for a board of school estimate, to which the board of trustees annually submits a proposed budget for the ensuing year. Following a public hearing, the board of school estimate fixes the amount of money needed for the operation of the college for the coming year, as well as the amount needed for capital outlay expenses, exclusive of such funds as may be received from the State or other sources. These amounts are certified to the board of freeholders. The latter must raise the sum needed for operation expenses by the assessment, levy and collection of taxes. Monies needed for capital outlay may be raised either by taxation or by the issuance of bonds. *N. J. S. A.* 18A:64A–19.

In addition to funds so raised at the county level, the statute anticipates a substantial amount of state support.

The board of higher education shall formulate annual budget requests for state support of county colleges. Within the limits of funds appropriated to the board of higher education for such purposes and in accordance with rules and regulations prescribed by the board of higher education, the board of trustees of a county college may apply to the board of higher education and receive state support:

a. For capital projects approved by the board of higher education in amounts not to exceed one half of the cost of said capital projects, and

b. For operational costs to the extent of one half thereof or $600.00 per equated full-time student, including such students resident in other counties, whichever is the lesser amount.

State support for the operational costs of county colleges shall be made within limits of state appropriation and only after an annual

review and approval by the board of higher education of the financial program for operation of the county college, including the charges to be made for student tuition and fees and the establishment of the county share of said costs. [*N. J. S. A.* 18A:64A–22]

Thus it would appear to have been the legislative intent that the State and county, in general, share equally in the financial support of a county college, dependent at all times, however, upon the availability of funds appropriated by the Legislature to the Board of Higher Education for this purpose.

The County College Bond Act supplements this financial arrangement. Initially it should be noted that this statute applies only to monies needed for capital outlay expenses and pertains only to the State's share of such expense. It has nothing to do with the financing of operational needs nor is it related to the county's share of capital expenditure. The scheme contemplates that a county will issue its bonds; the proceeds received upon the sale of these bonds will then be devoted to making up the State's share of the cost of a particular approved capital outlay. Thereafter recurrent interest payments will be met by State appropriations as will the principal of the bonds at their maturity. When funds appropriated by the Legislature to the Board of Higher Education for county college purposes are insufficient to satisfy the State's share of capital projects, resort may be had to the procedure outlined in the act. Pursuant thereto the Chancellor first certifies to the State Treasurer the amount of State support recommended for such project and the amount available within the limit of State appropriations. The State Treasurer then makes an independent analysis as to the "necessity or advisability of making available additional State support." *N. J. S. A.* 18A:64A–22.2. Assuming a favorable determination, he then certifies to the freeholders of the county the amount of bonds that may be issued by the county and that will come within the favor of the statute. The act fixes an overall ceiling of $40,000,000 upon the amount of bonds that may be so issued.

Within one year after receiving such State approval, the county may issue bonds in the designated amount. The statute directs that as interest and principal payments fall due, they will be met by State appropriations. Thus it is contemplated that bonds in an amount initially approved by the State will be issued by the county and as they mature be paid by the State. This is not all, however, because the statute concludes with the following provision:

Bonds or notes issued under the provisions of this act shall not be deemed to constitute a debt or liability of the State or a pledge of the faith and credit of the State but are dependent for repayment upon appropriations provided by law from time to time. [*N. J. S. A.* 18A:64A-22.8]

The validity of the legislation is challenged upon the ground that it violates Article VIII, § 2, paragraph 3 of the New Jersey Constitution, commonly known as the debt limitation clause.[1]

----

[1]This constitutional provision reads as follows:

The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon. All money to be raised by the authority of such law shall be applied only to the specific object stated therein, and to the payment of the debt thereby created. This paragraph shall not be construed to refer to any money that has been or may be deposited with this State by the government of the United States. Nor shall anything in this paragraph contained apply to the creation of any debts or liabilities for purposes of war, or to repel invasion, or to suppress insurrection or to meet an emergency caused by disaster or act of God.

As will be seen, the statute contains an apparent internal inconsistency which must be resolved. It purports on the one hand to provide for the payment of county bonds by means of State appropriations, while on the other hand it disavows any obligation on the part of the State that can be characterized as a debt or liability. If the issuance of bonds by a county in reliance upon the statute can be said to create a debt or liability on the part of the State, either to the county or to the bondholders, then the debt limitation provision mentioned above has been violated. If not, the Constitution is in no way offended.

The trial court interpreted the act as requiring the State to fulfill the obligation of payment in the manner set forth in the statute, deciding at the same time that the provision quoted above, purporting to insulate the State from liability, did not have that effect, but only precluded action against the State by bondholders. (114 *N. J. Super.* at 241).

It is an accepted principle of statutory interpretation that, if possible, legislation will be so read as to sustain its constitutionality. Our reading of the statute differs from that of the trial judge. We hold that the bonds do not become the obligations of the State and that the statute does not impose upon the State a legally binding or enforceable obligation to pay them or to reimburse the county upon its making payment. Accordingly we conclude that there is no infringement of the debt limitation provision of the Constitution.

Although there is doubtless a strong likelihood that payment of the bonds will in fact be met by legislative appropriations, we find nothing in the statute compelling the State to make such payments as a matter of law. Hence, both issuing counties and purchasing bondholders are on notice that the faith and credit of the State will not be pledged in respect of bonds issued pursuant to this enactment, but that payment on the part of the State will be dependent upon

appropriations provided from time to time. Lacking such appropriations, recourse can be had only against the county which will have no recourse over against the State.

In reaching this conclusion, we are mindful of the decisional law in this State which has dealt with the constitutional provision here under examination. A debt limitation provision very similar to that in our present Constitution appeared as Article IV, § VI, paragraph 4 of the Constitution of 1844, and has been said to have provided a pattern for debt limitation clauses in other states. *Heins, Constitutional Restrictions Against State Debt,* 8 (1963).

In *Wilson, Atty. Gen. v. State Water Supply Commission,* 84 *N. J. Eq.* 150 (E. & A. 1915), the Attorney General sought to enjoin the carrying out of a contract whereby the State Water Supply Commission had undertaken to purchase a tract of land for the sum of $1,000,000, the purchase price to be in the form of bonds in that amount, secured by a mortgage upon the land purchased. As Chancellor Walker's opinion at the trial level indicates, the contract provided that the bonds should create no indebtedness or liability on the part of the State and that the bondholders would be limited, in any resort to payment, to the property itself or to any appropriation that might thereafter be made by the Legislature. *Wilson v. State Water Supply Commission,* 82 *N. J. Eq.* 32, 35–36 (Ch. 1913). The majority of the Court of Errors and Appeals held that there was a constitutional violation. Determining that the Commission was the *alter ego* of the State, the court went on to read the constitutional provision literally as applying to all obligations, including those the payment of which was circumscribed as indicated above. In dissent, Justice Swayze argued that such indebtedness as there may have been, if any, was that of a subordinate public agency rather than of the State itself and furthermore that this was not the kind of debt envisioned by the framers of the Constitution. His opinion went to to say,

No property can be held for the payment of the purchase price except the very property itself. It is expressly provided that the claims

of bondholders shall not be enforced against other holdings, property or rights of the commission. The authority to use assets of the commission unappropriated is no more than an authority to use funds actually in hand for a legitimate public purpose, very much as the proceeds of sale of riparian lands are used for the school fund. The provision for the payment into a sinking fund of any moneys which shall be appropriated by any legislature toward the principal, leaves it entirely optional with each successive legislature whether to · appropriate or not, and in no way contravenes or modifies the express provision that the mortgage and bonds shall not create or constitute any indebtedness or liability of the state. Whatever a legislature may thus appropriate hereafter is a voluntary appropriation for a legitimate public purpose. [84 *N. J. Eq.* at 162]

*New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949) posed the issue as to whether bonds of the plaintiff Authority did or did not constitute debts or liabilities of the State within the intendment of Article VIII, § 2, paragraph 3 of the Constitution of 1947. The statute creating the Turnpike Authority authorized it to issue bonds which should not, however, "be deemed to constitute a debt or liability of the State * * * or a pledge of the faith and credit of the State," and which should be repayable "only from the tolls, other revenues and proceeds of such bonds * * *." *N. J. S. A.* 27:23–2. Despite this explicit language it was earnestly argued "that because the State created the Turnpike Authority, the State is, as a matter of law, responsible for its debts." In reply the court said,

: This view flies in the face of long established principles with respect to the status of public corporations in the field of government. Though created by the State and subject to dissolution by the State, they are in the eyes of the law independent entities and the State is not responsible for their debts and liabilities, whether they be municipal corporations or counties or such specialized bodies as the Port of New York Authority; Cf. *California Toll Bridge Authority v. Wentworth,* 212 *Cal.* 298, 298 *P.* 485 (1931). [3 *N. J.* at 243]

The court distinguished *Wilson v. State Water Supply Commission, supra,* on a number of grounds and sustained the validity of the challenged statute.

In *McCutcheon v. State Building Authority,* 43 *N. J.* 46 (1953), the court was called upon to pass upon the validity of statutes creating the State Building Authority and authorizing it to acquire and operate various facilities designed to house state officers and other personnel. The Authority was given the right to issue bonds, the proceeds of which were to be used to construct the required buildings, which were then to be leased to the State at rentals sufficient to pay off the bonds over a designated span of years. The legislation contained a specific provision that the bonds were not to be deemed a debt or liability of the State nor a pledge of its faith and credit. A majority of the court found the arrangement to be in violation of the debt limitation clause of the Constitution. It was said that the Authority was an instrumentality of the State designed to construct and make available facilities which the State could not itself have erected and paid for with the proceeds of its own bonds, except upon compliance with the debt limitation clause, and that this therefore constituted an impermissible contrivance to avoid the constitutional limitation upon state debt. It was pointed out that the rents paid were intended to be sufficient in amount to meet all operating expenses incident to maintaining the structures and to redeem the bonds upon maturity, while meeting debt service requirements during the interim. Thus the arrangement was held to be in reality a series of purchases rather than leases, since the State could acquire title to the buildings, upon the bonds being paid, by simply dissolving the Authority. In essence the court concluded that the leases between the State and the Authority, while purporting to call for annual rental payments, in fact obligated the making of annual appropriations to be applied upon the purchase price, the entire sum of which became a "liability" at the time of entering into the lease. As so viewed, the scheme, in the eyes of the majority, ran afoul of the debt limitation clause.

Justice Jacobs, speaking in dissent for himself and Justice Brennan, took sharp issue with the views of the majority. He

disputed the conclusion that rentals falling due in future years should be regarded as present debts or liabilities and argued that only upon entering into a lease was any liability upon the part of the State undertaken and that it must then be ascertained from the lease itself and not from the statutes creating the Authority. In the view of the dissenting justices, there was no constitutional insufficiency in the statutory arrangements since no present debt or liability came into being as a result of the act under scrutiny.

*Passaic v. Consolidated Police, etc., Pension Fund Commission,* 18 *N. J.* 137 (1955) bears even more directly upon the issue before us here. The Legislature had enacted a statute effecting a comprehensive revision of the law relating to pension and retirement arrangements for policemen and firemen. The new law consolidated all then existing funds into a single fund and placed it under the control and supervision of a Policemen and Firemen's Fund Commission established in the Department of the Treasury. Provision was made for contributions both from employer-municipalities and from the State in amounts adequate to achieve actuarial solvency over a prescribed span of years. With respect to the State's contribution the statute stated,

The State of New Jersey shall contribute annually, throughout a period of thirty years, commencing July first, one thousand nine hundred and fifty-three, such amount as may be necessary to make up the balance of each annual payment required by subdivision (b) (2) of this section, so as to bring to actuarial solvency at the expiration of said thirty-year period the consolidated fund hereby created. The amount of such annual contributions by the State shall be certified to the State Treasurer by the actuary of the commission at the time required for other State departmental budgetary certifications. All funds necessary to meet the State's share of said annual payments shall be included in the annual State budget and appropriated by the Legislature. [*L.* 1952, *c.* 358, *pp.* 1155-6]

One of the constitutional objections made was that the statutory scheme, appearing to require future appropriations, was in violation of the debt limitation clause. Chief Justice Vanderbilt, speaking for a unanimous court, said,

We also reject the argument that the statutory provision requiring the State to contribute to the fund constitutes the creation of a state debt contrary to *Article* VIII, *Section* II, *paragraph* 3 of our Constitution. No debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund. [18 *N. J.* at 147]

The point is that a projected or anticipated future legislative appropriation is not a present debt or liability. A future legislature is not bound to make the appropriation. Elsewhere, and in almost identical context, such language, appearing to mandate a future appropriation, has been described as "only an expression of a future intention or expectation which has no legally binding effect." *Massachusetts Housing Finance Agency v. New England Merchants National Bank*, 356 *Mass.* 202, 249 *N. E.* 2d 599, 609 (Sup. Jud. Ct. 1969). As was said in *McCutcheon, supra*,

* * * [I]t is fundamental in the Constitution that, while the Legislature may within constitutional limits, lay a contractual obligation upon the State, one Legislature cannot charge succeeding Legislatures with the duty of making appropriations. [13 *N. J.* at 66]

Further elucidation of this principle appears in *State by McLean v. Lanza*, 27 *N. J.* 516 (1958). By the so-called Round Valley Act of 1956, *N. J. S. A.* 58:20-1 *et seq.*, the Legislature authorized the acquisition, for water supply purposes, of part or all of the area commonly known as Round Valley, located in Hunterdon County. In addition to making provision for funds to pay for the property — to be acquired either by purchase or condemnation — the Legislature also directed that payments be made to the municipalities affected, in order to reimburse them for the loss of tax ratables, and that both municipalities and counties be reimbursed for any expense to which they might be put for relocating any municipal or county roads made necessary by the acquisition. The major challenge to the statute was that it created a debt or liability of the State to certain municipalities and counties without the question having first been submitted to the

voters as required by Article VIII, § 2, paragraph 3 of the
1947 Constitution. In response to this argument the court
said,

But the Legislature has not thereby, in any manner, created "a
debt or debts, liability or liabilities of the State" for the purchase
price of the real property found essential to the consummation of the
project, nor did it intend so to do; it has merely made provision
for the replacement of the local tax losses, and the payment of the
cost of relocating municipal or county roads made necessary by "the
acquisition or use of property" pursuant to the act, all attending the
fulfillment of an undertaking in the interest of the general health
and welfare, the "payments required" by that "section" to be even-
tually reimbursed from the proceeds of the sale of water thereby to be
supplied, and thus it is an inherently voluntary subsidiary measure
to avert economic crisis in the functioning of its own local subdivisions
of government as a direct result of its own action for the common
good of its inhabitants in a critical area of state responsibility, the
basic object of the legislation. [*State by McLean v. Lanza*, 27 *N. J.*
at 524]

Similarly here, any future appropriations made by the State
in payment of bonds issued pursuant to the County College
Bond Act would be "inherently voluntary subsidiary
measure[s]" to meet a foreseeable fiscal need "in the func-
tioning of its own local subdivisions of government" —
counties — "as a direct result" of state action taken "for the
common good of its inhabitants in a critical area of state re-
sponsibility", such state action here being the sponsoring
of county colleges as one method of meeting the need of its
citizens for more facilities dedicated to higher education. In
*Lanza* the court concluded that there had been no violation
of the debt limitation clause.

Most recently, in *Clayton v. Kervick,* 52 *N. J.* 138 (1968),
this Court was called upon to consider whether the debt lim-
itation clause was in any way offended by the statute creating
the New Jersey Educational Facilities Authority, *N. J. S. A.*
18A.72A–1 *et seq.* This act provided for the creation of an
Authority empowered to construct projects (college or other
educational buildings) for participating public and private
educational institutions, the cost to be repaid in the form of

rents or, in some cases, the repayment of loans. The Authority was authorized to issue bonds which were not, however, to be considered debts or liabilities of the state or a pledge of the faith and credit of the state. *N. J. S. A.* 18A:72A–10. The arrangement was very similar to that in *McCutcheon,* but here the court went the other way (one justice dissenting in part) and upheld the validity of the enactment. The court substantially restated, with approval, the dissenting opinion in *McCutcheon.* Although the majority opinion in *McCutcheon* was not expressly overruled, it obviously retains little vitality today.

Of the cases discussed above, *Passaic v. Consolidated Police, etc., Pension Fund Commission* and *State by McLean v. Lanza* are closest in point to the matter before us. In each of those cases, as is true here, the statute under review purported to provide for, or clearly anticipated, the future repayment or funding of a proposed expenditure or commitment by later legislative appropriation, and in each case this was held not to create a present debt or liability on the part of the State. Despite the language of the County College Bond Act, which might seem on its face to require the State to pay the bonds, we do not so interpret the statute. Rather, noting as we must the explicit declaration in the act itself that the bonds shall not be debts or obligations of the State, bearing in mind the trend of our own decisional law and mindful of our obligation to sustain as constitutional any legislative enactment if that can reasonably be done, we repeat that the bonds are not the obligations of the State but only of the counties that decide to issue them. Furthermore a county may not turn to the State for exoneration or reimbursement.

█ Respondent, in his brief, has argued a further point not raised below. He contends that if this court should sustain the appellants' position, then there will result an inequity as among different counties in the state. He notes that some counties acted quickly after the passage of the en-

abling act providing for the creation of county colleges, *N. J. S. A.* 18A:64A–1 *et seq.,* and therefore, presumably, received one-half the cost of capital outlays directly from the State as provided in *N. J. S. A.* 18A:64A–22. On the other hand, counties only now undertaking a county college program, and being compelled to proceed under the County College Bond Act, may be forced to issue their bonds to cover the State's one-half share of the capital expenditure without any certainty of ultimate repayment by the State.

We do not perceive that this creates any legal problem. In respondent's complaint it is stated that from the proceeds of a state bond issue devoted to purposes of higher education and adopted by the voters in 1968, the sum of $47,000,000 was allocated to capital expenditures of county colleges and that this sum has been entirely spent or committed. We must accordingly assume that in adopting the County College Bond Act the Legislature was providing another means to supply further funds for the support of county colleges. This it is perfectly at liberty to do by any legal method it may choose. Indeed it may discontinue all appropriations should it see fit to do so. The appropriation of funds in limited amount which are exhausted before there is a college in every county does not obligate the Legislature to see that similarly appropriated funds will thereafter be made available to all other counties.

For the reasons heretofore expressed the judgment of the trial court is reversed and judgment is entered in favor of appellants.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.