775 A.2d 586 (2001)
341 N.J. Super. 465
Steven M. LONEGAN; Stop the Debt.Com, LLC, Plaintiffs-Appellants,
v.
STATE of New Jersey; State Treasurer Roland M. Machold; New Jersey Educational Facilities Authority; New Jersey Economic Development Authority; New Jersey Transportation Trust Fund Authority; and New Jersey Sports and Exposition Authority, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 2001.
Decided June 27, 2001.
*588 Andrew T. Fede, Hackensack, for appellants (Contant, Atkins, Rogers, Fede, Keane & Hille, attorneys; Mr. Fede, on the brief).
Allison E. Accurso, Assistant Attorney General, for respondents State of New Jersey; State Treasurer Roland M. Machold; New Jersey Educational Facilities Authority; New Jersey Economic Development Authority; and New Jersey Transportation Trust Fund Authority (John J. Farmer, Jr., Attorney General, attorney; Ms. Accurso, of counsel; Patrick DeAlmeida, Deputy Attorney General, on the brief).
Courter, Kobert, Laufer, Hackettstown, for respondent New Jersey Sports and Exposition Authority (Kevin M. Hahn appeared. Charles J. Sinclair submitted a letter relying on the brief submitted on behalf of the other respondents).
Cynthia J. Jahn, Milford, for amicus curiae New Jersey School Boards Association (Michael F. Kaelber, Trenton, on the brief).
Before Judges PETRELLA, NEWMAN and WELLS.
*587 The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiffs Steven Lonegan, who is the Mayor of Bogota, and Stop the Debt.Com, LLC (collectively Lonegan) appeal from the entry of summary judgment in the Law Division declaring that the Educational Facilities Construction and Financing Act (EFCFA), N.J.S.A. 18A:7G-1 et seq., and other statutes authorizing contract bond financing do not violate the State Constitution's Debt Limitation Clause, N.J. Const., Art. VIII, § 2,¶ 3.
On December 28, 2000, plaintiffs filed a verified complaint and obtained an order to show cause in an action in lieu of prerogative writs seeking declaratory and other relief in the Law Division to prevent the sale of contract bonds without voter approval. Plaintiffs alleged that the EFCFA and various other statutes authorizing contract bond financing have in effect unconstitutionally increased the State's debt without voter approval in violation of the cited Debt Limitation Clause. Plaintiffs sought a judgment declaring that all statutes authorizing the sale of contract bonds to be paid out of the State's General Fund without voter approval were unconstitutional. In addition, they sought an order permanently enjoining the Legislature from enacting such statutes without voter approval and preliminarily enjoining defendants from issuing contract bonds without voter approval during the pendency of the action. Defendants cross-moved for summary judgment.
When the matter was heard on January 24, 2001, the judge denied plaintiffs' application for preliminary injunctive relief on the basis that Lonegan could not demonstrate a reasonable likelihood of success on the merits. The judge then held that contract bond financing does not violate the Debt Limitation Clause and granted summary judgment in favor of defendants and dismissed plaintiffs' complaint.
Plaintiffs filed a timely notice of appeal and defendants filed a motion for direct certification to the Supreme Court. On February 22, 2001, the Supreme Court denied the motion. We denied plaintiffs' motion to stay the sale of bonds under the challenged statutes pending determination of this appeal.[1]
*589 On appeal, Lonegan argues the Law Division Judge erroneously concluded that the Debt Limitation Clause does not bar contract bond financing without voter approval. Essentially, Lonegan claims that so-called contract bond financing by the State and its agencies is a subterfuge employed solely to avoid and contravene the Debt Limitation Clause of our Constitution. Additionally, Lonegan contends that the judge erred in finding that plaintiffs were not entitled to a preliminary injunction enjoining the issuance of contract bonds pending resolution of the matter and in hearing defendants' cross-motion for summary judgment on less than twenty-eight days notice.

I.
On July 18, 2000, the Governor signed into law the Educational Facilities Construction and Financing Act (EFCFA), N.J.S.A. 18A:7G-1 et seq. Enacted in response to Abbott by Abbott v. Burke, 153 N.J. 480, 710 A.2d 450 (1998) (Abbott V)[2], the EFCFA was intended by the Legislature to meet the constitutional responsibility imposed on it by the Supreme Court to provide adequate educational facilities. N.J.S.A. 18A:7G-2b. Specifically, the EFCFA provides State funding and allows the Economic Development Authority (EDA), created by L. 1974, c. 80, effective August 7, 1974 (N.J.S.A. 34:1B-1 et seq.), to act as a general construction manager for the maintenance, construction and renovation of school facilities, predominantly in the Abbott districts.[3]N.J.S.A. 18A:7G-2c.
To that end, the EDA is authorized to issue bonds, incur indebtedness and borrow money to fund these projects.[4]N.J.S.A. 18A:7G-14a. Payment arrangements for debt service on the bonds issued by the EDA are made through a procedure referred to as contract bond financing. N.J.S.A. 18A:7G-17 and 18. The EDA and the State Treasurer are authorized to enter into a contract under which the Treasurer agrees to pay from the General Fund to the EDA "an amount equal to the debt service amount due to be paid in the State fiscal year on the bonds or refunding bonds...." N.J.S.A. 18A:7G-17. A sinking fund[5] is also contemplated for *590 the eventual retirement of the bonds at maturity, or any call date, again out of general treasury funds.
However, bonds issued by the EDA are the limited obligations of the EDA and
shall not be a debt or liability of the State or any agency or instrumentality thereof ... either legal, moral or otherwise, and nothing contained in this act shall be construed to authorize the authority to incur any indebtedness on behalf of or in any way obligate the State or any political subdivision thereof, and all bonds and refunding bonds issued by the authority shall contain a statement to that effect on their face.

[N.J.S.A. 18A:7G-14f.]
Any obligations incurred by the State as a result of the contract and all payments from the General Fund are declared to be "subject to and dependent upon" annual appropriation of such funds by the Legislature. N.J.S.A. 18A:7G-17 and 18. The contract between the State Treasurer and the authority expressly states that it shall not constitute a debt of the State and disclaims any obligation on the part of future Legislatures. The sale documents provided to contract bond purchasers similarly state that there is no legal obligation on the Legislature to appropriate money to repay the bonds and no remedy should the Legislature fail to do so. Thus, contract bonds would appear to provide no legal right to compel payment by the State should the Legislature fail to make the necessary appropriations (see N.J.S.A. 18A:7G-14g), as opposed to general obligation bonds, wherein the State pledges its faith and credit, and its taxing power, towards their repayment.
Plaintiffs point out that the lack of a pledge on behalf of the State raises questions as to why an investor would purchase bonds from a non-revenue generating facility if there is no guaranteed source of funding for the repayment of principal, let alone interest. Abbott V points out that such bonds, even though not backed by the State's faith and credit, are viewed in the market as only "one notch less than a general obligation of the State, [because] there would be significant repercussions to the State and its credit rating were the Legislature not to make an annual appropriation." 153 N.J. at 523, 710 A.2d 450.
Contract bond financing similar to that provided in the EFCFA has become a common method of funding utilized by the Legislature to bypass or circumvent the voter approval requirement of the Debt Limitation Clause.[6] In all such statutes, *591 neither the bond nor the contract between the State Treasurer and the authority places a direct obligation upon the State to appropriate money to pay bondholders. Although some of the authorities involved generate revenue, no independent revenue is generated to support the bonds issued under the EFCFA. The State Treasurer uses solely taxpayer generated funds from the general treasury to pay interest and principal on EFCFA bonds.

II.
Lonegan asserts that contract bond financing, as authorized by the EFCFA and other statutes, constitutes a debt incurred without voter approval in violation of the Debt Limitation Clause, N.J. Const. Art. VIII, § 2, ¶ 3.[7] Summary judgment was based on undisputed facts. We now consider whether the Law Division properly applied the law construing the Debt Limitation Clause. Prudential Property Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998).
The adjudication of a statute's constitutionality is described as "[o]ne of the most delicate tasks a court has to perform" which should be exercised "with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives." N.J. Sports & Exposition Authority v. McCrane, 61 N.J. 1, 8, 292 A.2d 545, appeal dismissed, 409 U.S. 943, 93 S.Ct. 270, 34 L. Ed.2d 215 (1972). Thus, statutory enactments are entitled to a presumption of validity that is only overcome by a showing that the act "is clearly repugnant to the Constitution." Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222, 486 A.2d 305 (1985). "Where alternative interpretations of a statute are equally plausible, the view sustaining the statute's constitutionality is favored." Secaucus v. Hudson County Bd. of Taxation, 133 N.J. 482, 492, 628 A.2d 288 (1993), cert. denied, 510 U.S. 1110, 114 S.Ct. 1050, 127 L. Ed.2d 372 (1994); accord N.J. Sports & Exposition Authority v. McCrane, supra (61 N.J. at 8, 292 A.2d 545). It is axiomatic, however, that "[w]herever a statute and the constitution come into conflict, the statute must give way." Secaucus v. Hudson County Bd. of Taxation, supra (133 N.J. at 493, 628 A.2d 288).
The Debt Limitation Clause, provides, in pertinent part:
The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged.

*592 Except as hereinafter provided, no such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

[N.J. Const. Art. VIII, § 2,¶ 3.]
Generally, the Debt Limitation Clause prohibits "one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum." City of Camden v. Byrne, 82 N.J. 133, 152, 411 A.2d 462 (1980)(quoting N.J. Sports & Exposition Authority v. McCrane, supra (61 N.J. at 13-14, 292 A.2d 545)).
The history of the Debt Limitation Clause sheds light on its purpose and places the instant dispute in context. The issuance of bonds by states began in earnest in the early 19th century when states borrowed heavily for the development of internal improvements such as banks, canals and railroads. See New Jersey Sports & Exposition Auth. v. McCrane, supra (61 N.J. at 40-41, 292 A.2d 545) (Weintraub, C.J., concurring and dissenting); Amos Tilton, Constitutional Limitations on the Creation of State Debt, in 2 Constitutional Convention of 1947 1708 (1951). Because many of these projects were initially profitable, borrowing increased until the country was struck by the panic of 1837, which was followed by the banking collapse of 1839. Tilton, supra, 2 Constitutional Convention at 1709. By 1842, nine states had defaulted on their obligations. Ibid. Although New Jersey had not incurred such debt up to that point, the experiences of its sister states led it to adopt the predecessor to the present Debt Limitation Clause in Article IV, Section 6, Paragraph 4 of the Constitution of 1844. Its central provisions are substantially similar to our current Debt Limitation Clause. The delegates to the 1844 Constitutional Convention obviously intended to impose fiscal responsibility upon the Legislature that would provide a safeguard against extensive borrowing, and specifically, the defaults experienced by other states. However, in more recent times the State has utilized authorities, many of which raise their own revenue, to engage in large capital projects, without, and perhaps in some cases to avoid, voter consideration of those projects. New Jersey Sports & Exposition Auth. v. McCrane, supra (61 N.J. at 25, 292 A.2d 545); see, e.g., N.J.S.A. 27:23-1 et seq. (Turnpike Authority); N.J.S.A. 27:12B-1 et seq. (Highway Authority); N.J.S.A. 27:25A-1 et seq. (South Jersey Transportation Authority); N.J.S.A. 5:10-1 et seq. (Sports and Exposition Authority).
That approach is essentially challenged in this case. The issue is whether contract bond financing constitutes "state debt" which was intended to be subject to the requirements of the Debt Limitation Clause. See New Jersey Turnpike Auth. v. Parsons, 3 N.J. 235, 242, 69 A.2d 875 (1949). After adoption of the 1947 Constitution our Supreme Court has on various occasions considered whether different forms of bond financing constitute a state debt subject to the Debt Limitation Clause, there by requiring voter approval, and generally determined:
[T]he prevailing rule in this State and elsewhere is that if under the enabling statute there is an express declaration that the bonds or notes are obligations of the authority alone, that the faith and credit of the State are not pledged for that satisfaction, and that the holders must look solely to the authority for payment, then the debt limitation clause is satisfied.
[N.J. Sports & Exposition Authority v. McCrane, supra (61 N.J. at 14, 292 A.2d 545).]
*593 In New Jersey Turnpike Auth. v. Parsons, supra (3 N.J. 235, 69 A.2d 875), the Court considered a challenge to the Turnpike Authority Act, which created the Turnpike Authority and empowered it to issue bonds payable from toll revenues, while expressly withholding any pledge of the faith and credit of the State. The Court held that the statute's explicit and unambiguous language "entirely negatives any possibility of the proposed bonds being in any manner debts or liabilities of the State by providing ... that the bonds of the Turnpike Authority `shall not be deemed to constitute a debt or liability of... or a pledge of the faith and credit of the State.'" Id. at 242, 69 A.2d 875; accord Clayton v. Kervick, 52 N.J. 138, 244 A.2d 281 (1968) (holding that statute authorizing the issuance of bonds by the EFA to construct facilities for participating higher educational institutions which were then leased by the authority to the institutions to pay the cost of the project, including the principal and interest on the bonds, does not violate the Debt Limitation Clause). In a later rejection of a similar challenge to the issuance of bonds by the New Jersey Sports & Exposition Authority, the Court held:
[I]f any debts that come into existence through the operation of a statute are not and cannot become debts of the State, and if the faith and credit of the State are not pledged to guarantee their payment, and future Legislatures are under no obligation to appropriate money to satisfy them in case of default, then there has been no trespass upon Article 8, § II, ¶ 3 of the Constitution.
[N.J. Sports & Exposition Authority v. McCrane, supra (61 N.J. at 13, 292 A.2d 545).]
This approach has been utilized even where independent authorities have no separate source of income and are in fact dependent upon annual legislative appropriations to pay the amount due on the bonds. In Holster v. Bd. of Trustees of Passaic County College, 59 N.J. 60, 279 A.2d 798 (1971), the Court reviewed the constitutionality of the County College Bond Act, N.J.S.A. 18A:64A-22.1 et seq. By way of supplement to a prior statute, the County College Bond Act provided State support for the cost of particular capital projects initially funded through bonds issued by the county. Id. at 63, 279 A.2d 798. "The scheme contemplates that a county will issue its bonds; proceeds from the sale will then be devoted to making up the State's share of the cost.... Thereafter recurrent interest payments will be met by State appropriations as will the principal of the bonds at their maturity." Id. at 64, 279 A.2d 798. The Court said that "[a]lthough there is doubtless a strong likelihood that payment of bonds will in fact be met by legislative appropriations, we find nothing in the statute compelling the State to make such payments as a matter of law." Id. at 67, 279 A.2d 798. Thus, the Court reasoned, the Debt Limitation Clause was not violated because successive Legislatures were not bound to make the appropriations. Ibid.
Similarly, Enourato v. N.J. Building Auth., 90 N.J. 396, 399, 448 A.2d 449 (1982), upheld the New Jersey Building Authority Act, N.J.S.A. 52:18A-78.1 et seq., which established the New Jersey Building Authority to construct and operate state office facilities. To fund construction, the act authorized the Building Authority to issue up to $250,000,000 in bonds. However, the act expressly provided, and the bonds state on their face, that the debt is that of the Building Authority and disclaims any State liability. Ibid. To repay the bonds the Building Authority leases the constructed facilities to the State for amounts specifically calculated to satisfy the Building Authority's bond obligations. *594 Id. at 402, 448 A.2d 449. In other words, the State pays the bonded indebtedness of the Building Authority, however, such payment is subject to appropriation by the Legislature which is not legally obligated by the lease. Ibid. Relying upon Clayton v. Kervick, supra (52 N.J. 138, 244 A.2d 281) and Holster v. Bd. of Trustees of Passaic County College, supra (59 N.J. 60, 279 A.2d 798), the Enourato Court held that the financing scheme did not create a debt of the State, noting that "[a]lthough the Act not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result ... the State is under no legal obligation to do so." Id. at 410, 448 A.2d 449; accord In re Loans of the New Jersey Property Liability Ins. Guaranty Ass'n., 124 N.J. 69, 76, 590 A.2d 210 (1991) (endorsing the line of decisions "finding that legislative expressions of intent to provide future funding do not create present debts of the State subject to the debt limitation clause ...").
The constitutionality of contract bond financing at issue here has not been specifically addressed by our Supreme Court. Nevertheless, the rationale of the cited decisions, while not identical, inform our decision. The cases we have alluded to reveal a consistently narrow construction of the Debt Limitation Clause by the Court, so that as long as future Legislatures are not legally bound to make future appropriations to pay the indebtedness the clause is satisfied.
This approach is consistent with the purpose of the Debt Limitation Clause. As stated, the first Debt Limitation Clause was enacted amidst the default of several state governments. Considering the historical context, it is likely that the central purpose of the clause was to prevent default on the State's obligations and be a restriction on incurring State debt by requiring voter approval as a way to enforce fiscal restraint. Thus, the strictures of the Debt Limitation Clause have been met if the State is not obligated on the bonds and cannot default.
Applying these principles to contract bond financing, it appears the Debt Limitation Clause has been satisfied. As stated, payments of principal and interest on bonds issued under the EFCFA are made through a contract between the State Treasurer and the EDA in which the Treasurer agrees to pay from the General Fund to the EDA "an amount equal to the debt service amount due to be paid in the State fiscal year on the bonds or refunding bonds...." N.J.S.A. 18A:7G-17. However, N.J.S.A. 18A:7G-17 and 18 expressly provide that all payments from the General Fund are subject to and dependent upon annual appropriation of such funds by the Legislature. N.J.S.A. 18A:7G-14a. N.J.S.A. 18A:7G-14f provides that bonds issued by the EDA are the limited obligation of the EDA and "shall not be a debt or liability of the State or any agency or instrumentality thereof...." Thus, contract bond financing, although perhaps imposing a moral obligation, does not legally obligate the Legislature to make the necessary appropriations to make principal and interest payments on the bonds or pay the principal at maturity. See N.J.S.A. 18A:7G-14f and g.
Lonegan argues that it is irrelevant that the Legislature is not legally obligated to pay the debt service on the bonds, referring to such provisions as a "legal fiction", because it is inconceivable that the Legislature would fail to appropriate the funds. That the Legislature will likely appropriate funds to repay the bonds is undisputed. As stated above, however, regardless of the likelihood that the Legislature will in fact make the payment, if a future Legislature is not legally bound to *595 make the appropriations, then there is no present debt offending the Debt Limitation Clause. Enourato v. N.J. Building Auth., supra (90 N.J. at 410, 448 A.2d 449); Holster v. Bd. of Trustees of Passaic County College, supra (59 N.J. at 71, 279 A.2d 798); Clayton v. Kervick, supra (52 N.J. at 144, 244 A.2d 281). Our case law has not considered it significant that the Legislature will almost certainly have to authorize payments in the event of an authority's default. The point is that should nonpayment occur, the State would not be in default as it has no legal obligation on the bonds.[8]
Lonegan also argues that the instant matter is distinguishable from the Court's prior decisions and instead, asserts that we should follow former Justice Handler's dissent in Spadoro v. Whitman, 150 N.J. 2, 695 A.2d 654 (1997). In Spadoro, the issue of the constitutionality of the Pension Bond Financing Act of 1997, N.J.S.A. 34:1B-7.45 et seq. (PBFA), and contract bond financing was raised. However, the matter was dismissed as moot when the bonds were sold before the Court decided whether to hear the case on the merits. Spadoro v. Whitman, supra (150 N.J. at 13-14, 695 A.2d 654). The PBFA utilized contract bond financing in authorizing the issuance of bonds by the EDA to pay the State's unfunded accrued liability on various pension funds. It provided for the repayment of the bonds by a contract between the EDA and the State Treasurer. Id. at 5-7, 695 A.2d 654.
In his dissenting opinion, joined by Justice Stein, Justice Handler concurred in the finding of mootness, but opined that the PBFA violated the Debt Limitation Clause. Id. at 2-14, 695 A.2d 654. Justice Handler distinguished Spadoro from prior decisions because (1) the EDA had no governmental function requiring funding and acted as a mere conduit to enable the State to issue bonds; (2) there was no separate source of income for the EDA to repay the bonds; and (3) the PBFA provided for the issuance of bonds merely to defray the ordinary operating expenses of government rather than for capital improvement, capital construction or the provision of special services. Id. at 9-11, 695 A.2d 654.
Initially, we note that while such a requirement might well be imposed, the Court's earlier decisions have not required that an authority have a separate source of income to satisfy the Debt Limitation Clause. See Enourato v. N.J. Building Auth., supra (90 N.J. 396, 448 A.2d 449); Holster v. Bd. of Trustees of Passaic County College, supra (59 N.J. 60, 279 A.2d 798). Also, the EFCFA provides for massive construction projects and repairs of school facilities, obviously capital improvements, as opposed to ordinary operating expenses of government. Thus, while the dissenting justices in Spadoro raised significant questions regarding the boundaries of the Debt Limitation Clause, particularly where an authority is acting as a mere conduit of the State, a majority of the Court has not yet endorsed those factors as a reason to depart from the established rule that future Legislatures must be legally obligated to make future appropriations to constitute a present debt running afoul of the Debt Limitation Clause. Accordingly, whether we agree with it or not, we are bound by the reasoning in the line of cases prior to Spadoro, and are constrained to conclude that in *596 accord therewith the EFCFA, and the contract bond thereby authorized, does not violate the Debt Limitation Clause in Article VIII, Section 2, Paragraph 3 of our State Constitution.[9]

III.
The Law Division Judge denied plaintiffs' request for preliminary restraints on substantive grounds, holding that they had failed to demonstrate a reasonable probability of success on the merits that would warrant the imposition of restraints. Plaintiffs maintain that the judge erred in failing to relax the requirement that litigants demonstrate a probability of success and requests us to enter preliminary restraints on appeal.
In light of our decision on the merits this claim is dismissed as moot.

IV.
Plaintiffs' procedural arguments are without merit and do not warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
The Rules of Court are to be read to provide a just result. The time limits in the rules and the procedures for orders to show cause applications and motions are not inflexible. See R. 1:1-2. In view of the public interest involved and the time sensitive nature of the matter, there was no error in the judge hearing the cross-motion and doing so on somewhat shortened notice.
Affirmed.
WELLS, J.A.D. (dissenting)
Turning substance into a masterpiece of form, the State asks us to hold that 8 billion dollars of remaining authorized bonds about to be sold to the public to fund Abbott district school repairs and improvements are not "debts of the state" within the meaning of the Debt Limitation Clause (Clause) of the State Constitution. N.J. Const., Art. VIII, § 2, ¶ 3. I am unable to join the majority in doing so. In my opinion, it is now time for the language and history of the Debt Limitation Clause, thoroughly described in the majority opinion, to speak out to limit the practice of issuing "contract debt."
The majority's ruling exempts the bonds at issue from the requirement under the Clause that (1) the indebtedness be limited in any one year to one per cent of the total amount appropriated by the general appropriation law for that fiscal year; and, (2) indebtedness in excess thereof be submitted to the voters for approval. This legal legerdemain in the case of these bonds for which there is no visible means of repayment except the taxpayers is accomplished by two simple but effective means: (1) the State Treasurer signs a contract which promises to pay the annual debt service from the General Fund "subject to annual appropriations" by the Legislature to cover the payments, N.J.S.A. 18A:7G-17; and, (2) a duly-created state authority, in this case, the New Jersey Economic Development Authority (EDA), borrows the money and issues the bonds. N.J.S.A. 18A:7G-14.
The practice is fully and accurately described by my colleagues in the majority opinion and in a concurring and dissenting opinion by two justices in Spadoro v. Whitman, 150 N.J. 2, 695 A.2d 654 (1997). In that case, the EDA, pursuant to statutory authorization and by the same method, floated 2.75 billion dollars of bonds to fund *597 the accrued unfunded liability on State pensions. The strongly-worded dissent criticized such debt as a violation of the Clause.[10]
Unlike Spadoro, the present case is not moot. We were told at oral argument that of the authorized 8.6 billion dollar issue, about ½ billion dollars had been sold. Contract debt has risen to over 11 billion dollars in 2000, about three times the amount of general obligation debt. See State Debt Report, November 2000. Unmistakably, as the Spadoro dissenters predicted, the sun is setting on the Clause.
[I]f the State is permitted to incur debt in order to meet current operating expenses, payable only from the State's general revenues, it is hard to imagine any debt issuance by a state agency that would run afoul of the Debt Limitation Clause.
[Spadoro, supra 150 N.J. at 12, 695 A.2d 654.]
It is barely arguable that contract debt is not debt of the State. Contract debt leverages the State's tax base just as general obligation debt leverages it. No clearer evidence could exist than that emanating from Wall Street itself. Moody's, a respected Wall Street bond analyst, in its February 2000 State Debt Medians Report states:
An increasing number of states are taking a closer look at new types of debt instruments, and the market, which is always seeking to diversify the nature of its holdings in a particular state, is receptive. As a result, Moody's is confronting new and increasingly complex issues regarding how to characterize debt in our debt ratio calculations.
Consequently, the definition of "net tax-supported debt" continues to evolve along with these developments in municipal finance. Traditionally, Moody's has defined "net supported debt" to include all debt serviced by tax revenues of a state, whether or not the state itself was the issuer. To reach the net figure, we deduct any debt that is self-supporting from enterprise revenues, debt that is serviced by another unit of government as well as appropriate sinking funds and short-term operating debt.
Among the trends that led Moody's to develop the net tax-supported debt concept was the growing reliance on appropriation backed and lease revenue debt. In most states, courts have determined that debt subject to annual appropriations is not debt within the constitutional provisions that limit the quantity of, or require voter approval for debt. However, our interest is not in how debt is defined from a legal point of view. Instead, our objective is to analyze the degree to which a state has leveraged its tax base, creating annual fixed and recurring obligations. In this context appropriation debt is no different than "true" debt.
Wall Street has no hesitancy in calling a duck a duck. For it, the taxpayers are committed, whether or not there is a binding obligation to appropriate the debt service every year.
While Wall Street measures the risk to the bond investor, our function is to enforce the plain dictates of the Constitution to protect the voters. The Judiciary must, therefore, be interested in "how debt is defined from a legal point of view." In that respect, I, like the dissenters in Spadoro, distinguish the line of cases approving *598 contract debt issued heretofore on two compelling grounds:
[W]hat is not highlighted or even acknowledged by that conclusion is that all of the other debt limitation cases contained features that distinguish the current bond case. In other cases, the independent authorities were clearly separate government entities that served special and discrete governmental purposes. See Enourato v. New Jersey Building Auth., 90 N.J. 396, 448 A.2d 449 (1982) (State created Building Authority which issued bonds to build and operate facilities for state agencies); New Jersey Sports & Exposition Auth., 61 N.J. 1, 292 A.2d 545 (State created the Sports & Exposition Authority to issue bonds to bring about the construction, operation and maintenance of a sports complex). Here, the EDA is functioning solely as a conduit to sell bonds. It is, in this context, a mere shell that serves no governmental function other than to issue the bonds for the State itself, becoming, in effect, a shield to insulate the State from being labeled a debtor. Furthermore, in other cases a separate source of income had been created by the independent authorities as a basis for funding their separate operations and fulfilling their specific public purposes. See Clayton, supra, 52 N.J. at 154, 244 A.2d 281 (rental payments to be made by various public and private colleges constituted separate source of income); New Jersey Turnpike Auth., supra, 3 N.J. at 238, 69 A.2d 875 (tolls and other revenues constituted separate source of income). Under the Bond Act, the EDA has no governmental function or purpose that requires funding as such, and no separate source of income is created to enable the EDA to repay the bonds.
[Spadoro, supra, 150 N.J. at 9-10, 695 A.2d 654.]
The first of these grounds focused upon the EDA itself as "a mere shell that serves no governmental function other than to issue bonds for the State itself" Spadoro, supra, 150 N.J. at 10, 695 A.2d 654. The EDA has no defined sphere of public action except "to shield the State from being labeled a debtor." Ibid. Nothing in the present record suggests that this now four-year-old characterization is obsolete. The EDA simply stands in for the State whenever and for whatever project borrowed money is required. It may be used for such widely diverse purposes as may suit the fancy of the Legislature. For instance, in Spadoro it authorized bonds to fund the accrued unfunded liability of the state pension systems. Here it is designated to fund repairs to educational facilities in the Abbott districts. The State Debt Report lists eight agencies for which EDA floated bonds for Newark Performing Arts, Liberty State Park and the Division of Developmental Disabilities in the Department of Human Services to name a few.
While flexibility and adaptability may generally be a hallmark of wise public policy, the EDA, with no limiting substantive function except alter-ego borrowing, commands a portfolio as broad and deep as that of the State itself. The Legislature can assign it any public project shorn of constitutionally-required monetary limitations or voter support required of borrowing against the State's credit in excess of such limits.
Thus the State, through the EDA, pits itself against the very grain of the Clause. It effectively places New Jersey in the same position as the Federal Government.[11]
*599 The second ground upon which the Spadoro dissenters focused to distinguish the prior line of cases is the lack of any "separate source of income as a basis for funding..." Spadoro, supra, 150 N.J. at 10, 695 A.2d 654. Where an independent authority which has revenue such as tolls or lease income borrows money it is, to continue the Moody's analysis, in effect leveraging that revenue, rather than the general tax base; consequently, the argument that such borrowings violate the Clause is less compelling. Indeed, in the cases mentioned by the Spadoro dissenters quoted above, those borrowings were approved in a factual context in which revenue existed to defray the annual debt service. In such cases, the inherent dictates of fiscal responsibility tend to limit the amount of the borrowing to that justified by the reasonably expected income.
But where there is no dedicated revenue, as in the case of EDA, it is manifest that the only thing being leveraged is the tax base itself. It is at this point that the both the spirit and the letter of the Clause are violated. The majority cites Holster v. Bd. of Trustees of Passaic County College, 59 N.J. 60, 279 A.2d 798 (1971) as a case in which contract debt was approved to fund the building of county colleges where there was no separate revenue source. But as the majority points out, there the bonds were not to be issued by an instrumentality of the State, such as the EDA, but by the several counties in which the county colleges were to be built. The tax base of the entire State was not being leveraged, but only that of the individual counties. The Spadoro dissenters also raised a third issue. They criticized borrowing "to defray the ordinary expenses entailed in the regular operation of government." There, as has been stated, the bonds went to fund the unfunded pension liability of the State pension funds. Presumably the dissenters meant that the State should have been paying this liability over the years as opposed to letting it accumulate. Here, the bonds are designated to pay for the remediation of the deplorable condition of educational facilities in the Abbott districts. In Abbott by Abbott v. Burke, 153 N.J. 480, 519, 710 A.2d 450 (1998) (Abbott V) the Court described these conditions:
It is undisputed that the school buildings in Abbott districts are crumbling and obsolescent and that this grave state of disrepair not only prevents children from receiving a thorough and efficient education, but also threatens their health and safety. Windows, cracked and off their runners, do not open; broken lighting fixtures dangle precipitously from the ceilings; fire alarms and fire detection systems fail to meet even minimum safety code standards; rooms are heated by boilers that have exceeded their critical life expectancies and are fueled by leaking pumps; electrical connections are frayed; floors are buckled and dotted with falling plaster; sinks are inoperable; toilet partitions are broken and teetering; and water leaks through patchwork roofs into rooms with deteriorating electrical insulation.
These conditions obviously did not arise overnight. The maintenance and repair of buildings and facilities is an ordinary expense of day-to-day operations. Only if such repairs and maintenance are carried from year to year do they qualify for treatment as a capital expense called "deferred maintenance." Thus, while bonding is normally appropriate to fund capital projects, I conclude that a distinct parallel exists between bonding for this expense and that criticized in Spadoro for *600 the unfunded pension liability. It is as suspect here as it was there.
Nevertheless, I am not unmindful that the Abbott Court, speaking through Justice Handler, who also wrote the dissent in Spadoro, approved a form of contract debt to solve the Abbott school crisis. He approved a Department of Education proposal for funding the needed construction:
In the past, property-poor districts that had a poor bond rating were unable to finance needed construction. Recognizing this, the DOE has recommended that the Legislature amend N.J.S.A. 18A:72A-1 to -58 to empower the Educational Facility Authority (EFA or Authority) to finance the construction and renovation of elementary and secondary schools in the Abbott districts. Under the proposed plan, a district would issue bonds in the amount consistent with its facilities' needs as expressed in its Plan. The district would then sell these bonds privately to the Authority, which would, in turn, sell them to the public. The Authority's bonds would receive a triple A rating, and the debt would be serviced using annual appropriations from the State. Because EFA-issued bonds are viewed in the market as one notch less than a general obligation of the State, there would be significant repercussions to the State and its credit rating were the Legislature not to make an annual appropriation.
[Abbott, 153 N.J. at 523, 710 A.2d 450.]
Did Justice Handler in that passage change his mind about the constitutional infirmities of contract debt when it came to funding the necessary improvements in the Abbott district schools? I think not. What is apparent is that the Department of Education proposed a plan which called for the local school districts to issue the bonds much in the same way as the counties had issued the bonds in Holster to fund the construction of the county colleges. That way of issuing contract debt, the Court had held, did not offend the Constitution because, in fact, the State was not the borrower. The Abbott approved plan did not transgress the Clause in the same way that the Holster plan had not. However, instead of proceeding through the EFA, the Legislature elected to designate the EDA to float the bonds. Thus, in my opinion, the Rubicon from constitutional to unconstitutional was crossed because the tax base of the entire State is pledged without voter approval.
The problem with contract debt financing is that it is too facile. At best, in its exaltation of form over substance it ignores the letter of the first line of the Clause against creating debt "in any manner" in violation of the Clause. At worst, it ignores the spirit of the entire Clause. The purpose to evade both the monetary limit and the need for voter approval, latent from the earliest judicial approval of contract debt, is now writ large in both the current debt balances and the ease with which the State diversifies Wall Street's state debt portfolios. But the Clause remains a fixture of our Constitutional framework. It must mean something. It arose out of a felt need to restrain the power of one Legislature to bind a succeeding one and to limit the exposure of the taxpayers to the economic risks of excessive borrowing. Now there is no practical restraint on borrowing except the Legislature's own sense of self-restraint, a state of affairs that the people surely did not envision when they adopted the Constitution.
I would reverse the trial court's grant of summary judgment and remand to the trial court to grant injunctive relief.
NOTES
[1] We were advised at oral argument that approximately $500 million worth of bonds were issued in April 2001 out of the approximate $8.6 billion authorized.
[2] This was the fifth in a series of Abbott decisions applying the abstract phrase "thorough and efficient" in the education context. See Bd. of Educ. of Deptford v. Deptford Township, 225 N.J.Super. 76, 84, n. 4, 541 A.2d 1080 (App.Div. 1988), aff'd as modified, 116 N.J. 305, 561 A.2d 589 (1989). Justice Handler in Abbott V seemed to approve the Department of Education's recommendation that the Legislature empower the Educational Facilities Authority (EFA) "to finance construction and renovation of elementary and secondary schools in the Abbott districts." Abbott by Abbott v. Burke, supra (153 N.J. at 523-524, 710 A.2d 450). However, the Court did not discuss the method of funding and did not rule on whether the proposal would violate the Debt Limitation Clause, N.J. Const., Art. VIII, § 2, ¶ 3. Instead of the EFA, the Legislature here used the EDA as the designated conduit agency.
[3] An Abbott district is defined as "one of the 28 urban districts in district factor groups A and B" as included in the appendix to Abbott v. Burke 119 N.J. 287, 394, 575 A.2d 359 (1990) (Abbott II). N.J.S.A. 18A:7F-3.
[4] The EFCFA authorizes the issuance of $8.6 billion in bonds by the EDA. N.J.S.A. 18A:7G-14a. The Legislative Fiscal Estimate reports that the "[c]osts in the early years will increase about $75 million per year until a level of about $770 million is reached in years 10-20, after which costs may decline."
[5] This appears to be the case based upon the sample contract provided in the record, but those documents refer to contract debt authorized for the Sports & Exposition Authority, not the EDA.
[6] See discussion infra at pages 474-475. Although plaintiffs have challenged all statutes authorizing contract bond financing, our review is primarily directed at the provisions of the EFCFA. The contract bond financing provisions of the EFCFA are substantially similar to those of the following statutes which are also challenged by Lonegan:

(1) The EDA is authorized to issue contract bonds by N.J.S.A. 34:1B-7.50 (the Pension Bond Financing Act of 1997).
(2) The Transportation Trust Fund Authority Act of 1984, N.J.S.A. 27:1B-20, authorizes the Transportation Trust Fund Authority (TTFA) to issue contract bonds.
(3) The New Jersey Sports and Exposition Authority (NJSEA) may engage in contract bond financing pursuant to N.J.S.A. 5:10-14.3 (the New Jersey Sports and Exposition Authority Law).
(4) The EFA is authorized to issue contract bonds by N.J.S.A. 18A:72A-42 (the Higher Education Equipment Leasing Fund Act), N.J.S.A. 18A:72A-65a (the Higher Education Technology Infrastructure Fund Act), and N.J.S.A. 18A:74-28 (Public Library Project Fund).
Lonegan incorrectly claims that N.J.S.A. 18A:72A-57 (the Higher Education Facilities Trust Fund Act) authorizes the EFA to issue contract bonds. Additional statutes authorize the issuance of contract bonds, but are not directly challenged by Lonegan. See e.g., N.J.S.A. 34:1B-7.16 (Economic Recovery Fund Act); N.J.S.A. 18A:72A-12.4a (the County College Capital Projects Fund Act); N.J.S.A. 18A:72A-78b (Higher Education Capital Improvement Fund Act).
[7] A recent discussion of the right of voters to be heard, although in a different context, is contained in Schundler v. Paulsen, 340 N.J.Super. 319, 774 A.2d 585, 590-591 (App. Div.2001) aff'd o.b., ___ N.J. ___, 2001 WL 641136 (2001).
[8] This increased risk in contract bonds is reflected by the bond market in the lower rating they receive from bond rating agencies than general obligation bonds. However, this increased risk is accompanied by increased overall costs due to a higher interest rate on the bonds.
[9] Were we not barred by that precedent we might join in our colleague's thoughtful dissenting opinion.
[10] There was no majority opinion in Spadoro because a unanimous Court declared the issue of the Debt Limitation Clause moot. The bonds had all been issued before the Court could decide the constitutional question.
[11] Art. I, § 8 of the Federal Constitution simply authorizes Congress "To borrow money on the credit of the United States."