590 A.2d 210

IN THE MATTER OF THE LOANS OF THE NEW JERSEY PROPER-
TY LIABILITY INSURANCE GUARANTY ASSOCIATION TO
THE NEW JERSEY AUTOMOBILE INSURANCE GUARANTY
FUND PURSUANT TO THE NEW JERSEY FAIR AUTOMOBILE
INSURANCE REFORM ACT OF 1990 (L.1990, C. 8).

Argued January 15, 1991—Decided May 16, 1991.

*J. Michael Riordan* argued the cause for appellant New Jersey Property Liability Insurance Guaranty Association (*Bressler, Amery & Ross,* attorneys, *J. Michael Riordan* and *Richard R. Spencer, Jr.,* of counsel, *Jordan S. Weitberg, Keith S. Barbarosh, Lori A. Connors, Sean T. O'Neil,* and *Lawrence D. Ross,* on the briefs).

*Douglas S. Eakeley,* Acting Attorney General of New Jersey, argued the cause for respondent State of New Jersey (*Douglas S. Eakeley,* attorney, *Jack M. Sabatino,* Assistant Attorney General, of counsel, *Sharon M. Hallanan* and *Patricia A. Kern,* Deputy Attorneys General, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The Court heard oral argument in this appeal with the argument in the related case of *State Farm Mutual Insurance Co. v. State*, 124 *N.J.* 32, 590 *A.*2d 191 (1991), also decided today; we assume familiarity with our opinion in *State Farm*. Here, the New Jersey Property Liability Insurance Guaranty Association (PLIGA) challenges Order No. A90–252 (the Order) of the Department of Insurance, dated December 21, 1990. The Order required PLIGA to pay into the New Jersey Automobile Insurance Guaranty Fund (Auto Fund) the assessments collected from property-casualty insurers pursuant to Section 74 (*N.J. S.A.* 17:30A–8a(9)) of the Fair Automobile Insurance Reform Act of 1990, *L.* 1990, *c.* 8 (Reform Act or the Act). PLIGA's challenge to the Order includes four claims: (1) that the loans PLIGA must make under Section 74 violate the debt limitation clause of the New Jersey Constitution, Article VIII, Section II, paragraph 3; (2) that the Reform Act's provision creating the loans is void for vagueness and thus a violation of procedural due process; (3) that PLIGA is entitled to a declaratory judgment setting the terms and conditions of the loans; and (4) that PLIGA is entitled to a judgment requiring the return of the loaned funds in the event that the Reform Act should be held unconstitutional. Since the last of these claims is now moot, or has been rendered premature, in view of our decision in *State Farm* that the Reform Act is facially constitutional, we address only the first three.

As discussed more fully in *State Farm, supra*, 124 *N.J.* at 43, 590 *A.*2d at 197, PLIGA was created in 1974 as a means for collecting assessments to cover unpaid claims against insurers that have become insolvent. See *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Casualty Co.*, 85 *N.J.* 384, 389–90, 427 *A.*2d 66 (1981). Under the Reform Act, PLIGA is assigned the additional duty of collecting separate assessments during the years 1990 through 1997; these funds are dedicated to payment of the debt of the New Jersey Automobile Full Insurance Underwriting Association (JUA).

After the Reform Act became law in March 1990, there were a considerable number of details to be worked out about administrative procedures for collecting and disbursing funds for the JUA bailout generally, and about the PLIGA assessments in particular. Further, many insurers filed actions challenging the constitutionality of the Act, in most of which PLIGA, as stakeholder of the assessment monies, was joined as a defendant. The assessment process set forth in Section 74 of the Act clearly contemplates, at a minimum, the initial collection of the JUA assessments by PLIGA, followed by the payment of the assessments into the Auto Fund. Despite various legal challenges by the insurers and PLIGA, PLIGA was required to proceed with collection of the assessments in July 1990. The Department of Insurance apparently permitted PLIGA simply to hold the collected assessments, while the Department and PLIGA attempted to negotiate more specific procedures and terms for the loans.

Negotiations continued through November of 1990, but the Department and PLIGA did not reach agreement on such issues as the establishment of a fixed source of repayment, an amortization schedule, and an interest rate. In December 1990, with negotiations apparently at an impasse and with the Commissioner of Insurance required by the Reform Act to secure payover of the assessments to the Auto Fund before year-end, the Commissioner issued Order No. A90–252. The Order required PLIGA to pay over the 1990 assessments by December 27, 1990 and specified PLIGA's recordkeeping, investment, and collection duties for future years. Most significantly for this appeal, the Order provided as follows for repayment of the loans:

(1)(a) The Automobile Fund shall repay said loans in a manner to be determined pursuant to paragraph (b) below out of whatever monies are available in the Automobile Fund, subject to their appropriation by the Legislature, after a determination by the Commissioner that there are adequate funds in the Automobile Fund for the retirement of the debt of the JUA or repayment of the loans is otherwise provided for, and subject to the approval of the Treasurer as required by Section 23(e) of the ... Act.

(b) Whereas the amount of the JUA debt and the quantity of funds available to pay that debt are at this time too uncertain to attempt to fix any meaningful repayment schedule for these loans, at a date not later than January 1, 1996, [PLIGA] and the JUA trustee shall meet with the Commissioner or his designee to establish a reasonable repayment schedule for the loans taking into consideration, among other issues, the monies collectible under Section 35 of the ... Act [*i.e.*, funds collected by the Department of Motor Vehicles for violation surcharges] which are to be remitted for repayment of the loans....

Citing a conflict between its duties under the Reform Act and Order, and its possible fiduciary duties to its member insurers, PLIGA, on December 26, 1990, in its capacity as a party to the *State Farm* action, made an emergent application to this Court, requesting either a stay of its payment of the loan funds or payment into the Court. That request was denied; PLIGA then simultaneously filed an appeal of the Order before the Appellate Division and petitioned this Court for direct certification. We granted certification and permitted argument of PLIGA's appeal together with the *State Farm* arguments.

I.

PLIGA asserts that the Reform Act's requirement that it remit loans to the Auto Fund in the amount of approximately $160 million per year violates the debt limitation clause of the New Jersey Constitution, article VIII, section II, paragraph 3, because that amount exceeds one percent of the State's total appropriations for the current fiscal year and has not been enacted in conformity with the constitutional provision. The debt limitation clause, in pertinent part, states:

The Legislature shall not ... create in any fiscal year a debt or debts ... which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein.... [S]uch law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally

qualified voters of the State voting thereon.... [*N.J. Const.* of 1947, art. VIII, § 2, ¶ 3.]

Concededly, the Reform Act does not specify particular ways and means to pay either the interest or the entire principal on PLIGA's $160 million loans, does not specify a time period for repayment, and has not been submitted to voters in a referendum. However, the State argues that the repayment of the PLIGA loans will require future appropriations and that the Reform Act thus does not create any present obligation to make specific future payments on the part of the State. In essence, we understand the State's position to be that provision for the repayment of the PLIGA loans is not a "debt" of the State within the meaning of the debt limitation clause.

The relevant provision of the Reform Act, Section 74, states the duty to make the loans in general terms, directing that PLIGA shall

[m]ake loans in the amount of $160 million per calendar year, beginning in calendar year 1990, to the New Jersey Automobile Insurance Guaranty Fund ... except that no loan shall be made pursuant to this paragraph after December 31, 1997. [*N.J.S.A.* 17:30A–8a(10).]

In the statute itself, the only provision made for repayment of the PLIGA loans is that under Section 35, dealing with the merit-rating surcharges to be imposed by the Division of Motor Vehicles for certain motor-vehicle violations and drunken-driving convictions. That section provides that the surcharges shall be paid over to the JUA and then, after the JUA passes out of existence on October 1, 1991, to the Auto Fund; finally,

[f]rom the date of certification by the Commissioner of Insurance that the monies collectible under this subsection are no longer needed to fund the association debt, monies collectible under this subsection shall be remitted to the New Jersey Property–Liability Guaranty Association ... to be used for payment of any loans made by that association to the New Jersey Automobile Insurance Guaranty Fund ... [*N.J.S.A.* 17:29A–35b(2).]

Taken together, Sections 35 and 74 of the Reform Act and the Commissioner's Order of December 21, 1990 indicate the following plan for repayment of the PLIGA loans. Presently, the only funds earmarked for such repayment are the proceeds from Department of Motor Vehicles violations surcharges, at

such time as they "are no longer needed to fund the [JUA] debt." Reform Act, Section 35, *N.J.S.A.* 17:29A–35b(2). The Commissioner must first certify that such funds are no longer needed for the JUA debt; the Legislature would then appropriate them for repayment to PLIGA; and the State Treasurer would then approve disbursement. *See* Order, *supra;* Reform Act, Section 35, *supra;* Act, Section 23e (*N.J.S.A.* 17:33B–5e). Since the scheme of the Reform Act does not contemplate that payoff of the JUA debts will be completed until approximately 1997–1998, the Commissioner's Order defers fixing any repayment schedule for the PLIGA loans until "not later than January 1, 1996." Order at 2, subparagraph (1)(b). Thus, three things are clear from the repayment plan as outlined in the statute and Order: (1) there is presently no fixed schedule for repayment; (2) there is presently no provision for payment of interest; and (3) it is presently uncertain what amount, if any, of proceeds from violations surcharges will remain in the Auto Fund for repayment to PLIGA after the JUA debt has been retired.

Most of the decisions in which this Court has construed the debt limitation clause fall into two categories. One group of decisions holds that the constitutional provision does not apply to the creation of debt by independent public corporate entities, *e.g.*, the Turnpike Authority, Building Authority, or Educational Facilities Authority. *See Enourato v. New Jersey Bldg. Auth.*, 90 *N.J.* 396, 448 *A.*2d 449 (1982) (bonds of the Building Authority were not obligations of the State); *New Jersey Sports & Exposition Auth. v. McCrane*, 61 *N.J.* 1, 292 *A.*2d 545 (1972) (State's pledges not to limit certain powers of the Sports and Exposition Authority, made to Authority's bondholders, did not create a liability of the State); *Holster v. Board of Trustees*, 59 *N.J.* 60, 279 *A.*2d 798 (1971) (bonds of Educational Facilities Authority do not create liabilities of the State); *New Jersey Turnpike Auth. v. Parsons*, 3 *N.J.* 235, 69 *A.*2d 875 (1949) (debts of Turnpike Authority are not debts of the State). Those

decisions are not directly relevant here, since there is no separate public corporation created to implement the Reform Act.

However, a second line of decisions, generally finding that legislative expressions of intent to provide future funding do not create present debts of the State subject to the debt limitation clause, is dispositive of the issue raised here by PLIGA. For example, in *City of Passaic v. Consolidated Police and Firemen's Pension Fund Commission*, 18 *N.J.* 137, 113 *A.*2d 22 (1955), the Court examined a pension statute that provided:

> The State of New Jersey shall contribute annually, throughout a period of thirty years ... such amount as may be necessary to make up the balance of each annual payment.... All funds necessary to meet the State's share of said annual payments shall be included in the annual State budget and appropriated by the Legislature. [*Id.* at 144, 113 *A.*2d 22.]

The Court rejected the plaintiff's contention that this provision violated the debt limitation clause, concluding that "[n]o debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund." *Id.* at 147, 113 *A.*2d 22.

The Court came to a similar conclusion in *City of Camden v. Byrne*, 82 *N.J.* 133, 411 *A.*2d 462 (1980). There, several counties and municipalities claimed that statutes apportioning various tax revenues to local governments required the Governor and Legislature to appropriate such revenues for their use. Although the Court's holding that the local governments had no entitlement to such appropriations was based on the "general appropriation" provision, New Jersey Constitution, article VIII, section II, paragraph 2, the Court further supported its conclusion by analysis of the debt limitation clause. Thus, the Court noted that the statutes in question were not enforceable appropriations, because they would, if so considered, violate the debt limitations clause. In *City of Camden v. Byrne*, the Court relied on a number of decisions holding that certain statutory provisions providing for future expenditures were not "debts" within the meaning of the constitutional prohibition. *See, e.g., Bulman v. McCrane*, 64 *N.J.* 105, 117–18, 312 *A.*2d 857 (1973)

(State's obligation to pay future installments of rent, to be paid out of current revenues as annually appropriated, was not a "present debt"); *State v. Lanza,* 27 *N.J.* 516, 143 *A.*2d 571 (1958) (State's assurance that it would pay municipalities amounts, *inter alia,* to replace property taxes lost due to condemnation for reservoir system, did not create a "debt" within meaning of debt limitation clause); *cf. Holster v. Board of Trustees, supra,* 59 *N.J.* at 71, 279 *A.*2d 798 ("a projected or anticipated future legislative appropriation is not a present debt or liability").

The provisions made under the Reform Act and Order No. A90–252 for repayment of the PLIGA loans clearly fall within the types of assurances of future payments that this Court has traditionally found not to be "debts." If anything, the repayment of the PLIGA loans is stated less definitely than, for example, the pension-fund contributions or the statutory allotments of revenues that were found not to be debts in *City of Passaic v. Consolidated Police and Firemen's Pension Fund Commission,* 18 *N.J.* 137, 113 *A.*2d 22 (1955) and *City of Camden v. Byrne,* 82 *N.J.* 133, 411 *A.*2d 462 (1980), respectively. The repayment of the PLIGA loans depends upon a number of contingencies—that there will be funds remaining from motor-vehicle violations surcharges after discharge of the JUA debt; that the Commissioner of Insurance will approve application of such funds to the repayment; that the Legislature will vote the necessary appropriation; and that the Treasurer will approve release of the funds. Thus, we conclude that the State's acceptance of the loans from PLIGA does not create a debt of the State and therefore does not violate article VIII, section II, paragraph 3 of the New Jersey Constitution.

## II.

PLIGA further claims that Section 74 of the Reform Act, directing collection and payover of the assessments, is unconstitutionally void for vagueness because it does not specify a promise of repayment, a term for the loans, or an interest rate.

In addition, PLIGA argues that the statute does not contain any express delegation of authority to the Commissioner to set the terms of the loans; and that, at any rate, the Commissioner's Order did not set forth the necessary terms. To the contrary, the State asserts (1) that PLIGA has no standing to bring a "void for vagueness" claim, in that it has no protected property interest in the assessments collected from insurers; (2) that PLIGA's claim does not meet the standards of the vagueness doctrine under existing law; and (3) that, even if the doctrine applied, the statute and the Order adequately specify the duties placed upon PLIGA.

■ Although PLIGA's standing to bring the vagueness challenge is at best doubtful, such a claim could perhaps be brought by its member insurers. However, even were the standing question clear, we would nonetheless reject PLIGA's claim on the merits. Vagueness challenges are, of course, typically brought in contexts implicating the enforcement of criminal statutes, and are usually based on a contention that procedural due process demands that no one should be prosecuted for violation of a statute, unless the statute provides adequate warning of the proscribed behavior and sufficient guidance to authorities charged with enforcement to prevent arbitrary application. *E.g., State v. Lee,* 96 *N.J.* 156, 166, 475 *A.*2d 31 (1984). PLIGA concedes that civil statutes in general, and economic regulations in particular, are subject to less stringent scrutiny under the vagueness doctrine. *See, e.g., State v. Cameron,* 100 *N.J.* 586, 591–92, 498 *A.*2d 1217 (1985) (statutes limited to civil penalties, and especially those dealing with economic regulation, are subject to a more tolerant analysis under vagueness doctrine). A commercial regulatory statute can be held unconstitutionally vague only if it is "substantially incomprehensible." *Exxon Corp. v. Busbee,* 644 *F.*2d 1030, 1033 (5th Cir.), *cert. denied,* 454 *U.S.* 932, 102 S.Ct. 430, 70 *L.Ed.*2d 239 (1981).

■ PLIGA's duties under the Reform Act are to assess its member insurers for amounts designed to net approximately

$160 million per year for 1990 through 1997, and to pay those collected assessments into the Auto Fund. Order No. A90–252 further specifies PLIGA's investment authority with respect to collected funds, the timing of its assessments of member insurers, the dates for remitting payments into the Auto Fund, and PLIGA's right to be reimbursed for certain expenses of complying with its statutory duties. Thus, PLIGA has been given reasonable notice of how it may comply with the actions required of it by the Reform Act. Moreover, PLIGA's assertion that the Act is infirm because it does not expressly delegate regulatory authority to promulgate necessary terms of the assessments and loans, does not comport with existing law. Contrary to PLIGA's position, statutes should be construed as giving regulatory agencies sufficient implied powers to fulfill legislative objectives. *See State Farm v. State, supra,* 124 *N.J.* at 54, 590 *A.*2d at 202 (citing *Allendale Field and Stream Ass'n v. Legalized Games of Chance Control Comm'n,* 41 *N.J.* 209, 217, 195 *A.*2d 620 (1963)). In that connection, in its explanation of the new regulations adopted pursuant to the Reform Act, the Insurance Department has acknowledged that for insurers otherwise unable to earn a fair return, the assessments may be regarded as expenses in determining whether rate relief is constitutionally mandated. *State Farm, supra,* 124 *N.J.* at 59–60, 590 *A.*2d 205–206. Similarly, the regulations mandate a reduction in rates if the assessments are ever repaid. *N.J.A.C.* 11:3–16(c). We discern from these regulatory enactments that the Insurance Department has realistically acknowledged that the assessments must be treated in a manner consistent with the contingent status of the provisions for repayment. Thus, we find that Section 74 of the Reform Act (*N.J.S.A.* 17:30A–8a(9)) is not unconstitutionally vague and does not offend standards of procedural due process.

### III.

Lastly, PLIGA requests a declaratory judgment on whether and under what conditions it is required to pay over the

assessments into the Auto Fund. In view of our holdings that the relevant provisions of the Act, as implemented by Order No. A90–252, do not violate article VIII, section II, paragraph 3 of the New Jersey Constitution and are not unconstitutionally vague, PLIGA at present remains obligated to make the loans as required by statute. Thus, the declaratory judgment claim appears superfluous. Because PLIGA has in fact already paid the 1990 assessments into the Auto Fund, and on the present record we have found no infirmities in the governing statutory provision, should PLIGA desire further relief, it would be remitted to proceedings to recover the previously paid assessments.

## IV.

The appeal filed by the New Jersey Property Liability Insurance Guaranty Association challenging the validity of Department of Insurance Order No. A90–252, dated December 21, 1990, is dismissed.

*For dismissal*—Chief Justice WILENTZ, and Justice CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.