819 A.2d 395

STEVEN M. LONEGAN; STOP THE DEBT.COM, LLC, PLAIN-
TIFFS–APPELLANTS, v. STATE OF NEW JERSEY; ROLAND
M. MACHOLD, TREASURER OF THE STATE OF NEW JER-
SEY; NEW JERSEY SPORTS AND EXPOSITION AUTHORITY;
NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY;
NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY;
NEW JERSEY TRANSPORTATION TRUST FUND AUTHORITY,
DEFENDANTS–RESPONDENTS.

Argued October 21, 2002—Decided April 9, 2003.

*Andrew T. Fede*, argued the cause for appellants (*Contant, Atkins, Rogers, Fede & Hille*, attorneys).

*Allison E. Accurso*, Assistant Attorney General, argued the cause for respondents State of New Jersey, Roland M. Machold, Treasurer of the State of New Jersey, New Jersey Educational Facilities Authority, New Jersey Economic Authority and New Jersey Transportation Trust Fund Authority (*David Samson*, Attorney General of New Jersey, attorney; *Mr. Samson, Ms. Accurso* and *Patrick DeAlmeida*, Deputy Attorney General on the brief).

*Sandy L. Galacio, Jr.*, submitted a letter in lieu of brief on behalf of respondent New Jersey Sports and Exposition Authority (*Courter, Kobert, Laufer & Cohen*, attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

Today we reject a broad challenge to the validity of fourteen New Jersey statutes authorizing contract or appropriations-backed debt. By our holding, we reaffirm over fifty years of precedent from this Court and align the Court, as before, with the decisions from a majority of our sister states. Our decision is based in the unambiguous and clear language of Article VIII, Section II, paragraph 3, of the New Jersey Constitution (the Debt

Limitation Clause or Clause), and in the State's reliance on the Court's precedents when crafting complex financing mechanisms responsive to changing market conditions. We are well aware of the need to maintain stability in respect of the variety of financial instruments authorized by the Legislature, and of the litigation that would result if we attempt to establish classes of debt that are governed by the Clause and classes that are not. To reject, at this late date, traditional legal rules relating to debt could have unintended consequences not anticipated by the Court. We leave to the legislative and executive branches, where it properly resides, the policy decision whether to propose a constitutional amendment redefining or otherwise altering the scope of the Debt Limitation Clause, or whether to restrain the creation of appropriations-backed debt by other means should the other branches deem such measures appropriate.

## I

### A

The procedural posture of this case has been set forth in *Lonegan v. State*, 174 *N.J.* 435, 809 *A.*2d 91 (2002) (*Lonegan I*), and will not be repeated here except by way of a brief summary. We note only that plaintiffs filed their complaint in December 2000, when they sought a declaration "that [the Education Facilities Construction and Financing Act] and other statutes authorizing contract bond financing [1] are unconstitutional" under the Debt Limitation Clause. *Lonegan I*, 174 *N.J.* at 441, 809 *A.*2d 91. The trial court rejected plaintiffs' challenge by grant of summary judgment to defendants, and a majority in the Appellate Division

---

[1] As defined in *Lonegan I*, "[t]he term 'contract bond' (or 'contract debt') describes bonds issued by an independent state authority on a contract between the State Treasurer and the authority stating that payment on the bonds by the State is subject to legislative appropriations. In contrast, general obligation bonds are enforceable state debts backed by the full faith and credit of the State." 174 *N.J.* at 440, 809 *A.*2d 91 (citing John Downs & Jordon Elliott Goodman, *Barron's Dictionary of Finance and Investment Terms* 171 (1991)).

concurred. *Lonegan v. State,* 341 *N.J.Super.* 465, 481, 775 *A.2d*
586 (App.Div.2001). The matter came before us as of right
because of a dissent in our intermediate appellate court. *N.J.
Const.* art. VI, § 5, ¶ 1; *R.* 2:2–1(a).

## B

*Lonegan I* was decided on August 21, 2002. In its initial
opinion, the Court held that the issuance of appropriations-backed
debt authorized by the Educational Facilities Construction and
Financing Act (EFCFA) was not violative of the Debt Limitation
Clause. 174 *N.J.* at 441, 809 *A.2d* 91. Our holding recognized
that the Legislature had enacted EFCFA to fulfill its constitution-
al obligation to fund new school construction mandated by this
Court in *Abbott v. Burke,* 153 *N.J.* 480, 710 *A.2d* 450 (1998) (*Abbott
V*). *Lonegan I, supra,* 174 *N.J.* at 441, 457–62, 809 *A.2d* 91
(discussing the State's obligations under *N.J. Const.* art. VIII, § 4,
¶ 1 (the Education Provision)). We observed that the "debt
authorized by EFCFA is *sui generis*" because of its constitutional
underpinnings in the Education Provision of our Constitution, as
reinforced by Article VIII, Section IV, paragraph 2 (the School
Fund Provision), which "separately authorizes state-backed school
bonds without reference to the Debt Limitation Clause." *Id.* at
461, 809 *A.2d* 91. In light of the State's reliance on the Court's
general approval of a similar financing scheme in *Abbott V,* and on
"our long line of precedents validating similar debt issued by an
independent authority," we sustained the state's school construc-
tion financing scheme. *Id.* at 462, 809 *A.2d* 91.

Although the EFCFA challenge was at the core of *Lonegan I,*
the plaintiffs attempted a broad attack on all legislative programs
financed through appropriations-backed debt. *Id.* at 439–41, 809
*A.2d* 91. Nonetheless, the Court chose to limit its holding to
EFCFA because plaintiffs failed to provide argument sufficiently
anchored in the specific financing schemes authorized by the
statutes they found objectionable. *Id.* at 440–41, 464–65, 809 *A.2d*
91. Unwilling to resolve issues of constitutional import without

legal and factual context, we sought a more focused discussion from the parties and "direct[ed] the Clerk of the Court to establish a schedule for additional briefing and reargument" to take place in the next court term. *Id.* at 464, 809 *A.*2d 91. More specifically, we asked

> [p]laintiffs [to] center their discussion on the financing mechanisms authorized by the statutes they find objectionable and on [the] different categories of contract debt reviewed in the case law of this and other states. We [also] ask[ed] the parties to assume in their presentations that the Court intends to reconsider its precedents sustaining contract debt (or debt subject to future appropriations), and to present argument related to those other approaches.
>
> [*Id.* at 464–65, 809 *A.*2d 91.]

We explained:

> Thus, for example, the parties should discuss whether the purposes of the Debt Limitation Clause are served when the debt authorized is backed by a revenue stream. Is it sufficient, for purposes of the analysis, that the revenue is realistically "anticipated" at the time the enabling statute is enacted or should that revenue be considered at the time of debt issuance? And, must that revenue be derived from the project financed (self-liquidating), *e.g.,* turnpike tolls, college tuition, or can it be from another source (the Special Fund Doctrine . .)? Are lease payments structured to cover the debt service on bonds issued to construct state office buildings a violation of the Debt Limitation Clause? Must the payments reflect fair market value rentals? Would it affect the analysis if the lease is a typical lease containing terms and conditions generally found in commercial leases? Although such payments resemble the "ordinary expenses of government" ... can they/should they be differentiated from pension contributions?
>
> [*Id.* at 465, 809 A.2d 91.]

This opinion follows briefing and oral argument on those questions.

## II

To place the Court's inquiry in context, we recount in condensed form the substantive background provided in *Lonegan I.* We begin, as we must, with the language of the Clause:

> The Legislature shall not, in any manner, create in any fiscal year a debt or debts, ... which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein.... [S]uch law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls

due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon. [*N.J. Const.* art. VIII, § 2, ¶ 3.]

In *Lonegan I* we explained that "[t]he scope and meaning of the restrictions imposed on the legislative branch by the [Debt Limitation] Clause have been discussed at length in an extensive body of case law spanning more than fifty years and covering a wide variety of bonding mechanisms adopted by the Legislature to meet the capital funding needs of the State." 174 *N.J.* at 438–39, 809 *A.*2d 91 (citations omitted). We observed:

In those cases the Court has almost universally sustained statutes authorizing the issuance of debt that is not backed by the full faith and credit of the State, generally when the debt is undertaken by an independent authority, most often when that authority has a revenue source available to service the principal and interest on the debt. The Court has reasoned that the Debt Limitation Clause is not implicated when the State is not legally obligated on debt issued subject to future annual appropriations.

[*Id.* at 439, 809 *A.*2d 91.]

Those conclusions directly followed from our review of that case law under the framework found in *In re Loans of the Property Liability Insurance Guaranty Association*, 124 *N.J.* 69, 75–76, 590 *A.*2d 210 (1991). There, Justice Handler analyzed the two dominant strains in the Court's Debt Limitation Clause jurisprudence: " 'decisions hold[ing] that the constitutional provision does not apply to the creation of debt by independent public corporate entities, ... [and] decisions generally find[ing] that legislative expressions of intent to provide future funding do not create present debts of the State subject to the ... [C]lause.' " *Lonegan I, supra,* 174 *N.J.* at 445, 809 *A.*2d 91 (quoting *In re Loans, supra,* 124 *N.J.* at 75–76, 590 *A.*2d 210). We observed that decisions in the first category "rely on the legal autonomy of the issuing authority[,] ... on specific language disclaiming any enforceable obligation on the part of the State," and, in some instances, on the availability of a special revenue source, *id.* at 450, 809 *A.*2d 91, whereas decisions in the second category "hold[ ] ...

that the Legislature's expression of intent to provide future funding does not create debt subject to the Debt Limitation Clause." *Ibid.* (discussing *In re Loans, supra,* 124 *N.J.* at 76, 590 *A.*2d 210). *See Enourato v. N.J. Bldg. Auth.,* 90 *N.J.* 396, 448 *A.*2d 449 (1982) (holding that bonds issued by New Jersey Building Authority for construction of facilities to be leased by State did not violate the Clause because payments were "subject to legislative appropriations" and State did not pledge full faith and credit to guarantee bonds); *N.J. Sports and Exposition Auth. v. McCrane,* 61 *N.J.* 1, 292 *A.*2d 545 (explaining that "the debt clause applies only to obligations which are legally enforceable against the State" and that debts of corporate agency created by Legislature neither bind State nor fall under Debt Limitation Clause), *appeal dismissed sub. nom. Borough of E. Rutherford v. N.J. Sports and Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972); *N.J. Tpk. Auth. v. Parsons,* 3 *N.J.* 235, 69 *A.*2d 875 (1949) (same). *See also City of Camden v. Byrne,* 82 *N.J.* 133, 152, 411 *A.*2d 462 (1980) (affirming Legislature's right not to fund various programs, deeming such programs suspended until adequate appropriations are made); *Bulman v. McCrane,* 64 *N.J.* 105, 312 *A.*2d 857 (1973) (holding that twenty-five year lease arrangement under which State would eventually assume ownership of leased building did not create present debt subject to Debt Limitation Clause even though future rent installments would be paid out of current revenues annually appropriated); *City of Passaic v. Consolidated Police & Firemen's Pension Fund Comm'n,* 18 *N.J.* 137, 113 *A.*2d 22 (1955) (holding that statute requiring State to contribute annually to Police and Firemen's Pension Fund was not violative of Clause because no present debt was created). Most important, despite the differences among the individual bonding mechanisms under consideration, we found that a unifying thread linked both groups of cases, to wit, that "the Debt Limitation Clause applies only when the State is legally obligated to make payments authorized by the Legislature." *Lonegan I, supra,* 174 *N.J.* at 446, 809 *A.*2d 91.

## III

As we directed in *Lonegan I,* the plaintiffs have presented argument regarding specific state statutes authorizing the issuance of appropriations-backed debt through independent state agencies and designed to fund diverse programs serving various short- and long-term objectives. *See, e.g.,* New Jersey Economic Development Authority Act, *N.J.S.A.* 34:1B–1 to –21.15 (funding initiatives to promote economy of New Jersey, increase employment opportunities, assist in development or redevelopment of political subdivisions of State, reduce industrial and commercial environmental pollution and promote commercial enterprise within State); New Jersey Transportation Trust Fund Authority Act of 1984, *N.J.S.A.* 27:1B–1 to –31 (authorizing initiatives to further State's transportation infrastructure, including public highways, public transportation projects and mass transit passenger service); New Jersey Sports and Exposition Authority Law, *N.J.S.A.* 5:10–1 to –38 (providing stadiums and other buildings and facilities in the Hackensack meadowlands for athletic contests and other expositions); New Jersey Educational Facilities Authority Law, *N.J.S.A.* 18A:72A–1 to –71 (financing construction of dormitories and educational facilities for public and private institutions of higher education); County College Capital Projects Fund Act, *N.J.S.A.* 18A:72A–12.1 to –12.8 (authorizing financing of county college capital projects); Tobacco Settlement Financing Corporation Act, *N.J.S.A.* 52:18B–1 to –14 (providing for acquisition and management of State's national tobacco settlement receipts). Plaintiffs assert that the financing mechanisms employed by those statutes generally have "common features" that, together, render them unconstitutional: a state authority that is authorized to "issue bonds for a [s]tate purpose;" language permitting the State Treasurer to enter into an agreement with the authority to pay the debt service on the authority's bonds; and language requiring "payments under the [s]tate contract [to be] 'subject to annual appropriations.'" In plaintiffs' view, the "subject to appropriation" qualification is meaningless because, as a practical matter, the State cannot default on such bonds without substantial nega-

tive impact on its credit rating and, therefore, on its access to financial markets. As a result, "subject to appropriation bonds" are effectively "full faith and credit bonds." Because both types of debt are supported by the State's general taxing power, both require voter approval under the Debt Limitation Clause.

Despite that broad claim of invalidity, however, in response to our initial inquiry requesting argument in respect of the "different categories of contract debt," with particular emphasis on debts "backed by a revenue stream" and on structured lease payments, the plaintiffs have narrowed the scope of their challenge by redefining contract or appropriations debt. They now describe this type of debt as a

> liability of the State, or any independent authority created by the State, which is unsupported by an adequate and independent revenue source, and which is to be amortized exclusively or primarily by funds derived from annual appropriations, or by tax-based revenue that is properly payable into the State's General Fund, absent a constitutional dedication of revenue.

So circumscribed, plaintiffs' challenge now distinguishes certain revenue bonds from most other contract debt. Debt that finances a toll road or bridge, a college, or a sports and entertainment facility, and that is retired from a "special fund" comprised of revenues generated by the financed facility or project (*e.g.*, from toll collections, tuition payments, or ticket sales), is exempt from the requirements of the Clause because general tax revenues are not tapped for repayment. *N.J. Sports & Exposition Auth., supra,* 61 *N.J.* at 10, 292 *A.*2d 545; *N.J. Tpk. Auth., supra,* 3 *N.J.* at 238, 69 *A.*2d 875; *accord Tuscon Transit Auth. v. Nelson,* 107 *Ariz.* 246, 485 *P.*2d 816, 821 (Ariz.1971); *California Toll Bridge Auth. v. Kelly,* 218 *Cal.* 7; 21 *P.*2d 425, 427 (1933); *Grossman v. Public Water Supply Dist. No. 1 of Clay County,* 339 *Mo.* 344, 96 *S.W.*2d 701, 706 (1936); *Laverents v. City of Cheyenne,* 67 *Wyo.* 187, 217 *P.*2d 877, 880–82 (1950).

Further, although plaintiffs' definition of contract debt does not on its face exempt bonds issued to finance the construction of facilities that are subsequently leased back to the State, a practice sustained by this Court in *Enourato, supra,* 90 *N.J.* at 409–11, 448

A.2d 449, plaintiffs do not challenge this type of contract debt. In such cases, the lease proceeds used to retire the bonds, like contract or appropriations-backed debt, are paid from general appropriations pursuant to contractual arrangements; however, plaintiffs consider those transactions distinct legal obligations that do not offend the Debt Limitation Clause so long as they are "*bona fide* leases" reflecting the fair market rental of the facility and containing terms typically found in commercial leases. *See Lonegan I, supra*, 174 *N.J.* at 492–93, 809 *A.*2d 91 (Stein, J., concurring in part and dissenting in part) (discussing scope of Court's holding in *Enourato, supra*, 90 *N.J.* at 410, 448 *A.*2d 449, and suggesting that *bona fide* leases might not come within strictures of Clause).

In its response to our inquiries, the State argues that the new rule advanced by plaintiffs is unsupported by the language of the Clause, and if adopted by this Court, would severely unsettle the State's financial operations. In the State's view, fifty years of this Court's jurisprudence have provided the Legislature with an objective and workable legal benchmark around which to craft fiscal policy without having to guess whether a particular borrowing scheme will offend the Debt Limitation Clause. To break with our past decisions and extend the Debt Limitation Clause to those debts that the State has no legal obligation to repay would inject uncertainty into State borrowing practices by "mir[ing] the Court in[to] drawing arbitrary and artificial distinctions among legally indistinguishable funding arrangements in complex commercial transactions[.]"

The State also claims that a number of state financing mechanisms that are "far removed from bond financing," such as "multi-year contract[s] subject to appropriation[s]," would be rendered constitutionally suspect, causing additional disruption to the state's finances. Those concerns led the State to move, in September 2002, for clarification of that portion of *Lonegan I* setting this matter down for reargument and stating that the Court's final disposition would not be applied retroactively. 174 *N.J.* 354, 807

*A*.2d 189 (2002). There, the Attorney General represented that residual uncertainty remained in respect of the validity of appropriations-backed bonds issued prior to the final disposition of this matter. In its supplemental brief, the State sets forth in detail the number and types of programs financed through appropriations-backed debt, ranging from the authority bonds specifically challenged by plaintiffs to lease-purchase agreements for real property, equipment, and services, and tax and revenue anticipation notes. In reliance on our past decisions, the State has made repayment subject to future appropriations and expressly disclaimed any enforceable legal obligation, thereby structuring those programs to comport with the bright line rule previously enunciated by this Court. *See Enourato, supra,* 90 *N.J.* at 410, 448 *A*.2d 449.

In response to plaintiffs' charge that there is no substantive difference between appropriations-backed debt and general obligation debt, the State points out that the former provides the State with the flexibility to renegotiate more favorable repayment terms as the need arises, a benefit not available with general obligation debt. *See* Reuven Mark Bisk, Note, *State and Municipal Lease—Purchase Agreements: A Reassessment,* 7 *Harv. J.L. & Pub. Pol'y,* 521, 523–24 (1984) (discussing "attractive financial benefits" of appropriations-backed leases). The State argues that there are constitutionally significant differences between the Legislature being "highly likely," rather than being "legally bound," to repay its debts. The prevailing rule, grounded in the plain language of the Clause and in those differences, provides the Legislature with the legal certainty it needs to develop fiscal policy.

## IV

We agree with the State. Under our case law, only debt that is legally enforceable against the State is subject to the Debt Limitation Clause. In reliance on that rule, the State has responded to changes in the financial markets that reflect modern

economic realities. The variety of financing mechanisms employed in both the private and the public sectors today were unheard of when the Debt Limitation Clause was made a part of our Constitution in 1844. Had the framers been prescient, they might have written the Clause differently. By its terms, however, the Clause as written requires voter approval only when the State is legally required to make payment on the debt it has incurred.

█ The Debt Limitation Clause was adopted in 1844 because of concerns about binding obligations imposed on future generations of taxpayers and because of unchecked speculation by the state. In *Lonegan I,* we observed that New Jersey's constitutional debt restriction was enacted originally to "protect against the type of financial debacle experienced" by other states that had borrowed without restraint during the 1830s. 174 *N.J.* at 443–44, 809 *A.*2d 91 (citations omitted). Those states financed public projects and speculated in western lands or banking schemes only to default on their obligations during the economic downturn that followed. *Ibid.* Today, states are routinely involved in activities such as road and railway construction and expansion, as well as other public works projects, that in the past were considered speculative but now are seen as essential and appropriate governmental functions. *See, e.g.,* Bisk, *supra,* 7 *Harv. J.L. & Pub. Pol'y* at 521–24 (discussing importance of lease-purchase agreements in enabling state governments to construct and upgrade schools, transportation systems, and other public infrastructure); Jerome Shestack, *The Public Authority,* 105 *U. Pa. L.Rev.* 553, 557 (1957) (noting that increased demand for public improvements in postwar era led to widespread creation of independent public authorities with power to incur debt). To paraphrase Justice Jacobs, yesterday's speculation has become "sound and economical current business practice[ ]. . . ." *McCutcheon v. State Bldg. Auth.,* 13 *N.J.* 46, 78, 97 *A.*2d 663 (1953) (Jacobs, J., dissenting), *overruled by Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449. When contract or appropriations-backed debt is issued, however, the State does not pledge its full faith and credit and is not legally bound to make

payment on that debt. *Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449; *N.J. Sports and Exposition Auth., supra,* 61 *N.J.* at 14, 292 *A.*2d 545. *See Wilson v. Ky. Transp. Cabinet,* 884 *S.W.*2d 641, 644 (Ky.1994) (holding that unconstitutional state debts do not arise when state does not pledge its full faith and credit); *Dep't of Ecology v. State Fin. Comm.,* 116 *Wash.*2d 246, 804 *P.*2d 1241, 1245–47 (1991) (same). *See also Black's Law Dictionary* 417 (6th ed.1990) (defining "default" as "the omission or failure to perform a legal or contractual duty").

In sum, the variety of functions assumed by the government since the 1800s, and the sophisticated means now used to finance those functions, make it difficult if not impossible to differentiate among acceptable and unacceptable types of twenty-first century appropriations-backed debt under a nineteenth-century paradigm. *See Book v. State Office Bldg. Comm'n,* 238 *Ind.* 120, 149 *N.E.*2d 273, 281 (1958) (opining that interpretation of debt limitation provision "constantly [must] be adapted to new questions and conditions which arise because of an ever-expanding economy and the progress of society"); *In re Okla. Capitol Improvement Auth.,* 958 *P.*2d 759, 771 (Okla.) (observing that "the framers of Oklahoma's debt limitation provisions cannot be presumed to have anticipated a financially sophisticated society in which goods and services are purchased . . . without a pledge of the full faith and credit of the state"), *cert. denied, Fent v. Okla. Capitol Improvement Auth.,* 525 *U.S.* 874, 119 *S.Ct.* 174, 142 *L.Ed.*2d 142 (1998). Even the plaintiffs concede that the Clause does not require the State to obtain voter approval each time appropriations-backed bonds are issued. They fail, however, to draw principled distinctions between structured lease payments and revenue bonds, and the types of appropriations-backed debt they find objectionable.

In *Lonegan I,* we adverted to the case law in other states, noting the various state appellate courts that followed the New Jersey approach. 174 *N.J.* at 452–53, 809 *A.*2d 91.[2] In contrast,

---

[2] Thirty-two states uphold some form of appropriations-backed debt as follows: *Opinion of the Justices,* 335 *So.*2d 376, 379–80 (Ala.1976); *Carr–Gottstein Proper-*

we discussed those cases that treated appropriations-backed debt "as legislative decisions to circumvent debt limitation restrictions." *Id.* at 453–54, 809 *A.*2d 91 (citing *Montano v. Gabaldon,* 108 *N.M.* 94, 766 *P.2d* 1328, 1330 (1989); *State ex rel. Ohio Funds Mgt. Bd. v. Walker,* 55 *Ohio St.*3d 1, 561 *N.E.*2d 927, 932, *reh'g denied,* 55 *Ohio St.*3d 722, 564 *N.E.*2d 502 (1990)). Those cases "rely . . . on practical considerations relating to the source of debt payments or the category of expenses funded by the debt." *Id.* at 455, 809 *A.*2d 91. Thus, in *Winkler v. State of West Virginia School*

*ties v. State,* 899 *P.*2d 136, 143–44 (Alaska 1995); *Dean v. Kuchel,* 35 *Cal.*2d 444, 218 *P.*2d 521, 523–24 (1950); *Glennon Heights, Inc. v. Central Bank & Trust,* 658 *P.*2d 872, 878–79 (Colo.1983); *Wilmington Med. Ctr. Inc. v. Bradford,* 382 *A.*2d 1338, 1346–48 (Del.1978); *State v. School Bd. of Sarasota County,* 561 *So.*2d 549, 552–53 (Fla.1990); *Sheffield v. State Sch. Bldg. Auth.,* 208 *Ga.* 575, 68 *S.E.*2d 590, 594–95 (1952); *In re Anzai,* 85 *Hawai'i* 1, 936 *P.*2d 637, 640–43 (1997); *Berger v. Howlett,* 25 *Ill.*2d 128, 182 *N.E.*2d 673, 674–75 (1962); *Book v. State Office Bldg. Comm'n,* 238 *Ind.* 120, 149 *N.E.*2d 273, 286–89 (1958); *State ex rel. Fatzer v. Armory Bd.,* 174 *Kan.* 369, 256 *P.*2d 143, 146–51 (1953); *Wilson v. Ky. Trans. Cabinet,* 884 *S.W.*2d 641, 645–46 (Ky.1994); *Edgerly v. Honeywell Info. Sys.,* 377 *A.*2d 104, 108 (Me.1977); *In re Request for Advisory Opinion Enrolled Senate Bill 558,* 400 *Mich.* 175, 254 *N.W.*2d 544, 546–547 (Mich.1977); *St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.,* 627 *S.W.*2d 64, 67–69 (Mo.Ct.App.1981); *Ruge v. State,* 201 *Neb.* 391, 267 *N.W.*2d 748, 750–52 (1978); *Employers Ins. Co. of Nev. v. State Bd. of Examiners,* 117 *Nev.* 249, 21 *P.*3d 628, 631–33 (2001); *Schulz v. State,* 84 *N.Y.*2d 231, 616 *N.Y.S.*2d 343, 639 *N.E.*2d 1140, 1148–50 (1994), *cert. denied,* 513 *U.S.* 1127, 115 *S.Ct.* 936, 130 *L.Ed.*2d 881 (1995); *Martin v. N.C. Housing Corp.,* 277 *N.C.* 29, 175 *S.E.*2d 665, 678–79 (1970); *Haugland v. City of Bismarck,* 429 *N.W.*2d 449, 454–56 (N.D.1988); *In re Okla. Capitol Improvement Auth.,* 958 *P.*2d 759, 767–775 (Okla.), *cert. denied, Fent v. Okla. Capitol Improvement Auth.,* 525 *U.S.* 874, 119 *S.Ct.* 174, 142 *L.Ed.*2d 142 (1998); *State ex. rel. Kane v. Goldschmidt,* 308 *Or.* 573, 783 *P.*2d 988, 993–96 (1990); *Kelley v. Earle,* 325 *Pa.* 337, 190 *A.* 140, 144–47 (1937); *Opinion to the Governor,* 112 *R.I.* 139, 308 *A.*2d 802, 807 (1973); *Caddell v. Lexington County Sch. Dist. No. 1,* 296 *S.C.* 397, 373 *S.E.*2d 598, 599–600 (1988); *McFarland v. Barron,* 83 *S.D.* 639, 164 *N.W.*2d 607, 609–11 (1969); *Ragsdale v. City of Memphis,* 70 *S.W.*3d 56, 63–70 (Tenn.Ct.App.2001); *Tex. Pub. Bldg. Auth. v. Mattox,* 686 *S.W.*2d 924, 928 (Tex.1985); *Mun. Bldg. Auth. of Iron County v. Lowder,* 711 *P.*2d 273, 277–81 (Utah 1985); *Dykes v. Northern Va. Transp. Dist. Comm'n,* 242 *Va.* 357, 411 *S.E.*2d 1, 8–10(on rehearing), *cert. denied, Tower v. Northern Va. Transp. Dist. Comm'n,* 504 *U.S.* 941, 112 *S.Ct.* 2275, 119 *L.Ed.*2d 201 (1992); *Dep't of Ecology v. State Fin. Comm.,* 116

*Building Authority*, 189 *W.Va.* 748, 434 *S.E.*2d 420 (1993), the court invalidated a system of contract bond financing for school construction similar to the program we upheld in *Lonegan I*. *Id.* at 435. Although the state had expressly disclaimed liability for the bonds issued by the School Building Authority, the court held that they constituted debts of the state because the only source of repayment for the bonds was general appropriations. *Id.* at 433; *see also Lonegan I, supra,* 174 *N.J.* at 454, 809 *A.*2d 91 (discussing *Winkler*). Notably, the court distinguished appropriations-backed bonds from self-liquidating bonds and from lease financing. *Id.* at 430; *see also Lonegan I, supra,* 174 *N.J.* at 454, 809 *A.*2d 91 (discussing *Winkler*).

Subsequently, in *Marockie v. Wagoner,* 190 *W.Va.* 467, 438 *S.E.*2d 810 (1993), decided five months after *Winkler, supra,* the court invalidated a statute which authorized the use of existing sales tax revenues to repay bonds issued by the School Building Authority. *Id.* at 812, 817. The court declared that "a special fund to retire bonds cannot come from existing taxes that are deposited in the general revenue fund," *id.* at 814, but added: "[I]f the Legislature creates a new tax source or increases the amount to be paid on an existing tax account, the new or increased amount may be used to liquidate revenue bonds" so long as the monies do not first pass through the general fund. *Id.* at 815. Then, in *McGraw v. Caperton,* 191 *W.Va.* 528, 446 *S.E.*2d 921 (1994), a case involving computer equipment contracts, the court declared that "one year contracts with multiple renewals and non-binding cancellation clauses do not create the type of debt prohibited" by the West Virginia Debt Limitation Clause. *Id.* at 929 (citing *W. Va. Const.* art. X, § 4). In those cases, the West Virginia Supreme Court of Appeals reaffirmed and expanded the exceptions to its holding in *Winkler.* Indeed, the court appears to have indicated in *Marockie* that *any* increase in taxes set apart as a special fund

*Wash.*2d 246, 804 *P.*2d 1241, 1245–46 (1991); *Dieck v. Unified Sch. Dist. of Antigo,* 165 *Wis.*2d 458, 477 *N.W.*2d 613, 617–21 (1991).

could be used to support revenue bonds.[3] Both cases suggest that the scope of exceptions to a broad rule of invalidity is a shifting concept that leads to uncertainty and generates litigation.

In respect of lease arrangements, whether or not the State takes title to the facilities on termination of the lease, those arrangements are, generally, a subspecies of appropriations-backed debt. *See In re Okla. Capitol Improvement Auth., supra*, 958 *P.*2d at 767 (observing that appropriations-backed bonds do not "differ from arrangements where state buildings are rented by state agencies pursuant to multi-year leases"). The Legislature appropriates the rental payments from general revenues pursuant to a lease agreement, which payments then are used to retire bonds issued to finance the construction of the leased facilities. As with other types of appropriations-backed debt, the State is not legally bound to make the rental payments and can opt not to do so. And, most likely, non-payment would adversely affect the State's credit rating. Yet, a variety of theories have been advanced to sustain such lease arrangements, *i.e.*, that the State must, in the normal course, lease facilities to carry out the operations of government, *see Spadoro v. Whitman*, 150 *N.J.* 2, 9–10, 695 *A.*2d 654 (1997) (Handler, J., concurring in part and dissenting in part) (approving of *Enourato*-type leases for financing construction of facilities to house State agencies); Bisk, *supra*, 7 *Harv. J.L. Pub. Pol'y* at 523 (noting that lease financing allows governments to

---

[3] There is substantial disagreement among state courts applying the special fund doctrine regarding the extent to which the special revenue source must be segregated from existing revenues. Comment, *The Judicial Demise of State Constitutional Debt Limitations*, 56 *Iowa L.Rev.* 646, 648 (1971). In some states, the special fund doctrine may be invoked only when bonds are scheduled to be retired from "income produced by the new facility alone." *Id.* at 649; *see, e.g., Scroggs v. City of Kansas City*, 499 *S.W.*2d 500, 502 (Mo.1973); *Diederichs v. State Highway Comm'n*, 89 *Mont.* 205, 296 *P.* 1033, 1035 (1931) (citing *Crick v. Rash*, 190 *Ky.* 820, 229 *S.W.* 63 (1921)). In other states, the courts have permitted legislatures to establish special funds with "revenue[s] from existing facilities" that are "functionally related" to the new venture. Comment, *supra*, 56 *Iowa L.Rev.* at 651; *see, e.g., Brack v. Mossman*, 170 *N.W.*2d 416, 422 (Iowa 1969); *City of Oxnard v. Dale*, 45 *Cal.*2d 729, 290 *P.*2d 859, 863 (1955).

purchase "needed real or personal property"); that a *bona fide* lease does not expend tax dollars over and above the amount required for those operations, *Lonegan I, supra,* 174 *N.J.* at 492–93, 809 *A.2d* 91 (Stein, J., concurring in part and dissenting in part); and that, under the common-law, lease payments are not debts until they fall due each year, *Clayton, supra,* 52 *N.J.* at 150, 244 *A.2d* 281 (citations omitted); *McCutcheon, supra,* 13 *N.J.* at 69, 97 *A.2d* 663 (Jacobs, J., dissenting) (citing *Gardiner v. William S. Butler & Co.,* 245 *U.S.* 603, 605, 38 *S.Ct.* 214, 62 *L.Ed.* 505, 506 (1918)), *overruled by Enourato, supra,* 90 *N.J.* at 410, 448 *A.2d* 449; *McFarland v. Barron,* 83 *S.D.* 639, 164 *N.W.2d* 607, 609 (1969) (citations omitted).

We do not discern constitutionally significant differences among these types of debt. We are therefore wary of taking the path followed by the minority of courts that have adopted the plaintiffs' approach. The dissent's "view [that] the phrase 'in any manner' constitutes a broad umbrella ... cover[ing] any legislative enactment that binds the state, either by design or by indirect result, to the payment of incurred debt out of general revenues," *post* at 23, 819 A.2d at 408–09, clearly goes too far. Even our dissenting colleagues draw back from that extreme approach by excluding debt supported by "adequate" and "independent" revenues, *id.* at 23–24, 819 A.2d at 408–09, despite the difficulty in determining both adequacy and independence. They also would exclude "labor agreements, leases, and any other arrangement or transaction that does not require the State's contractual borrowing of funds," *id.* at 24, 819 A.2d at 409, even though, in certain of those transactions debt costs are included and the State is bound for a period of years. Under the reasoning of the dissent, the "in any manner" language of the Clause would appear to cover those arrangements. We are therefore unable to discover a principled basis for the exemptions accepted by the dissent.

In *Lonegan I,* Justice Stein focused on Standard and Poors' statement that " 'a significant credit deterioration for all types of debt issued by [a] defaulting government' " will occur if the State

declines to appropriate contract debt payments. *Lonegan I, supra,* 174 *N.J.* at 466, 809 *A.*2d 91 (Stein, J., concurring in part and dissenting in part) (quoting Standard & Poors, Revised Lease and Appropriation Backed Debt Rating Criteria (June 13, 2001)). Justice Stein further asserted that "[n]o one disagrees that the State, as a practical matter, must repay its appropriations debt in order to maintain the stability of its credit in the bond market." *Id.* at 467–68, 809 *A.*2d 91 (Stein, J., concurring in part and dissenting in part). For him, the Court's longstanding interpretation of the Clause has led to a "legal artifice that permits the State to issue [appropriations] debt . . . without voter approval," with the result that the State "increasingly has relied on [such] debt in recent years." *Id.* at 505, 809 *A.*2d 91 (Stein, J., concurring in part and dissenting in part).

The State acknowledges that payments on appropriations debt are "highly likely." It is certainly the case that in recent years appropriations debt has increased substantially, and that the financial markets anticipate the likelihood of legislative appropriations when they set interest rates on the different types of state debt. We, too, acknowledge the realities of the marketplace. Yet, as Justice Stein also pointed out,

> the Debt Limitation Clause may no longer be the most relevant contemporary standard for determining whether the issuance of additional State debt is economically sound.
>
> [*Id.* at 468, 809 *A.*2d 91.]

He observed "that the bond rating agencies consider the ratio of debt service to annual revenues to be a more accurate gauge of a State's capacity to carry additional debt." *Ibid.* However that determination is made, in our view, judgments about the issuance of debt when the State's full faith and credit is not implicated are best left to the other branches of government.[4]

---

[4] Indeed, Justice Stein recognized that fact when he suggested a delay in his proposed remedy. *Lonegan I, supra,* 174 *N.J.* at 500–504, 809 *A.*2d 91 (Stein, J., concurring in part and dissenting in part).

In *Schulz v. State*, 84 *N.Y.*2d 231, 616 *N.Y.S.*2d 343, 639 *N.E.*2d 1140 (1994), *cert. denied*, 513 *U.S.* 1127, 115 *S.Ct.* 936, 130 *L.Ed.*2d 881 (1995), the New York Court of Appeals rejected a challenge to a transportation bond act in which appellants "attack[ed] the statute both as imprudent fiscal policy and as violative of [the] debt-limiting provisions of the State Constitution." *Id.* at 1142. The Chief Judge's conclusion is telling:

> In sum, neutral principles of law and consistent precedents of this Court, upon which decades of commercial transactions have been premised, lead us to uphold the validity of the particular legislation before us. If (as plaintiffs urge) modern ingenuity, even gimmickry, have in fact stretched the words of the Constitution beyond the point of prudence, that plea for reform in State borrowing practices and policy is appropriately directed to the public arena[.]

*[Id.* at 1150.]

*See also Wilson, supra,* 884 *S.W.2d* at 645–46 (deferring to constitutional authority of legislature even though "it is fashionable to bemoan the explosion of debt in our society").

■   The concerns expressed by a minority of jurisdictions, and echoed by the dissents in *Lonegan,* can be addressed only by the Legislature in our tri-partite system of government. *N.J. Const.* art. III, ¶ 1. We are unwilling to disrupt the State's financing mechanisms in the circumstances presented to us, and agree with the majority of state courts interpreting their own constitutions that the restrictions of the Debt Limitation Clause do not apply to appropriations-backed debt.

## V

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

LONG, VERNIERO, and ZAZZALI, JJ., dissenting.

Today's decision construes the Debt Limitation Clause so narrowly that the Clause no longer applies, except in those increasingly rare instances when the State seeks to incur general-obligation indebtedness. In 1991, legal scholars observed:

[T]he New Jersey Supreme Court has, with the exception of ... *McCutcheon* [*v. State Building Authority,* 13 *N.J.* 46, 97 *A.*2d 663 (1953), *overruled by, Enourato v. New Jersey Building Authority,* 90 *N.J.* 396, 448 *A.*2d 449 (1982)*]*, been remarkably willing to sustain *any* financing scheme the state legislature devises. Given the liberality with which the court has treated these financing schemes, one can reasonably conclude that the constitution provides *no limit* on the state's power to incur debt.

> [Stewart E. Sterk and Elizabeth S. Goldman, *Controlling Legislative Shortsightedness: the Effectiveness of Constitutional Debt Limitations,* 1991 *Wis. L.Rev.* 1301, 1340. (emphasis added).]

When those commentators made that observation there was room for doubt. Now it has become reality.

We respectfully dissent. We agree substantially with the opinion expressed by Justice Stein in *Lonegan v. State,* 174 *N.J.* 435, 466, 809 *A.*2d 91 (2002) (*Lonegan I*) (Stein, J., concurring in part, dissenting in part). We add these comments to amplify and supplement that opinion.

The aim of the Debt Limitation Clause is to place a constraint on government. It is one of the few clauses intended to empower the people by giving them a direct voice in managing the State. The framers recognized that some transactions might provide immediate funding to fuel governmental projects but disperse the true financial costs to future generations. They enacted the Debt Limitation Clause to reserve to the people the right to decide whether a particular level of debt is essential to satisfy an important public purpose.

The Court was correct in *Lonegan I, supra,* when it stated that "[a] literal interpretation of the Debt Limitation Clause that eviscerates the strictures the Clause expressly contains cannot serve the constitutional mandate." 174 *N.J.* at 440, 809 *A.*2d 91. It is incorrect when it essentially now employs such an interpretation, at the State's urging, to hold that so-called "contract" or "appropriations" debt is constitutional. We conclude that such debt is not constitutional unless approved by voters.

We need not repeat Justice Stein's careful analysis of our prior case law. Suffice it to say that we agree with that analysis and Justice Stein's conclusion that

of all the Debt Limitation Clause cases only *Enourato* holds that debt issued by a state authority that lacks an independent revenue source and contemplates the use of rental payments from the State, authorized by annual legislative appropriations, as the source of the Authority's bond amortization payments, is sustainable without voter approval under the Debt Limitation Clause. The scope of the Court's holding in *Enourato* obviously is debatable. The Court's opinion emphasized in part that "[t]he Authority's bonds and notes are not a debt of the State," *Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449, but also focused in part on the principle that State liability for rent does not constitute debt: "[T]he State may incur liability for future rentals without violating the debt limitations clause." *Ibid.* Although the State's rental payments under the statute upheld in *Enourato* were calculated to be sufficient to satisfy the authority's obligations on the bonds, that portion of the State's rental payments that equaled the fair rental value of the buildings occupied did not necessarily cause the State to *increase* its annual appropriation for rents; arguably, only the amount by which the rental payments required to amortize the bonds exceeded such fair rental value caused an increase in appropriations attributed directly to the bond issue. Although not expressly relied on by the Court, the recognition, also expressed by the dissenters in *McCutcheon, supra,* 13 *N.J.* at 75, 97 *A.*2d 663 (Jacobs and Brennan, Jr., JJ., dissenting), that the State would be making rental payments as a tenant even absent the Authority funding mechanism undoubtedly was a factor underlying the Court's disposition. In my view, *Enourato* should not be read as holding the Debt Limitation[ ] Clause inapplicable whenever a state authority issues its own bonds without voter approval or an adequate independent revenue source and to be amortized solely by funds annually appropriated by the Legislature.

[*Lonegan I, supra,* 174 *N.J.* at 492–93, 809 *A.*2d 91 (Stein, J., concurring in part, dissenting in part).]

The Debt Limitation Clause provides in relevant part that "[t]he Legislature shall not, *in any manner,* create in any fiscal year a debt or debts, liability or liabilities of the State" in excess of a threshold amount described in the Clause, unless certain conditions are satisfied, and unless "approved [at a general election] by a majority of the legally qualified voters of the State voting thereon." *N.J. Const.* art. VIII, § 2, ¶ 3 (emphasis added). In our view, the phrase "in any manner" constitutes a broad umbrella that covers any legislative enactment that binds the State, either by design or by indirect result, to the payment of incurred debt out of general revenues.

The sheer volume of contract or appropriations debt ($10.8 billion or seventy-five percent of the State's June 30, 2002, debt of $14.3 billion) makes it virtually impossible for the State to default on such obligations without severe and unacceptable harm to New

Jersey's credit rating. Thus, for all practical purposes, the State ultimately is responsible for that indebtedness within the meaning of the Debt Limitation Clause.

> [U]ndisputed is that the State never has defaulted and, as a practical matter, cannot default on its appropriations debt, and that the credit markets and bond rating agencies regard appropriations debt as substantially equivalent to general obligation debt because "a failure to appropriate will result in a significant credit deterioration for all types of debt issued by the defaulting government."
>
> > [*Lonegan I, supra*, 174 *N.J.* at 466, 809 *A.*2d 91 (Stein, J., concurring in part, dissenting in part) (quoting Standard & Poor's, Revised Lease and Appropriation–Backed Debt Rating Criteria (June 13, 2001)).]

We would hold that the Debt Limitation Clause is violated when the Legislature, without voter approval, enacts legislation authorizing an authority or other State entity to borrow money or otherwise incur indebtedness, in excess of the threshold set forth in the Clause, that is (1) unsupported by adequate revenues that are independent of taxpayer funds, and (2) amortized primarily or completely by annual legislative appropriations. Excluded from that holding would be labor agreements, leases, and any other arrangement or transaction that does not require the State's contractual borrowing of funds.

To rule otherwise is to trespass on the right of voters to approve or disapprove the State's ever-increasing contract indebtedness. We acknowledge that our intended holding would require the legislative and executive branches to alter significantly the manner in which they approach that form of indebtedness. Accordingly, we would stay our disposition for an appropriate period to afford the other branches the opportunity to address the mandate of the Debt Limitation Clause by the least disruptive methods. We also would grandfather all existing transactions that otherwise might be constitutionally infirm, leaving them undisturbed. See *id.* at 501–03, 809 *A.*2d 91 (Stein, J., concurring in part, dissenting in part) (articulating standard for prospective application of Court decisions).

Lastly, we reject the notion that we should steer clear of our intended remedy because it simply is too difficult to implement or too burdensome to the State. This Court must never avoid its

duty on that basis. "The Court's choice is either to recognize [the] indisputable reality [that appropriations debt is indistinguishable from general-obligations debt], or to subvert the Constitution by allowing the State to continue to issue appropriations debt as if the Debt Limitation Clause did not exist." *Id.* at 500, 809 A.2d 91 (Stein, J., concurring in part, dissenting in part). Our choice is to respect and enforce the constitutional mandate.

*For affirming*—Chief Justice PORITZ, and Justices COLEMAN, LaVECCHIA and ALBIN—4.

*For reversing*—Justices LONG, VERNIERO and ZAZZALI—3.